**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| MONICA SCOTT;<br>AUGUSTA MOODY; and<br>FAITH BOOKER,<br><br>    Plaintiffs,<br><br>v.<br><br>MCDONALD'S CORPORATION;<br>MCDONALD'S USA, LLC; and<br>MCDONALD'S RESTAURANTS OF<br>FLORIDA, INC.,<br><br>    Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>**And Demand For Jury Trial** |

## INTRODUCTION

1.  This is a civil rights action brought by Plaintiffs Monica Scott, Augusta "Gus" Moody, and Faith Booker, who seek redress for racial harassment, race discrimination, and retaliation at the hands of their employer, McDonald's Corporation, McDonald's USA, LLC, and McDonald's Restaurants of Florida, Inc. (together, "McDonald's" or "Defendants").  Plaintiffs are Black.  McDonald's has subjected them and other Black employees of the corporate owned and operated McDonald's restaurant at 5525 Walt Loop Road in Lakeland, Florida ("the Walt Loop McDonald's Restaurant") to a racially hostile working environment and disparate treatment because of their race. When Plaintiffs dared to complain about this mistreatment, McDonald's retaliated against

them by reducing their hours, refusing to promote them, disciplining them, and/or downgrading their performance evaluations.

2.     The General Manager of the Walt Loop McDonald's restaurant disciplines Plaintiffs and other Black employees more harshly than employees who are not Black and refuses to grant Plaintiffs and other Black employees requested time off, while allowing employees who are not Black to take time off as requested.  The General Manager treats Black employees and customers with contempt.  She makes racist comments about Black people, like "it's always Black people who want free stuff," Black people are "aggressive and trying to fight," and "all they want to do is smoke weed." When confronted about her comments, she has insisted they are true.  The General Manager even called the police on a Black customer when the customer complained about issues in the restaurant.  This pervasive racist environment causes Plaintiffs severe emotional distress and trauma.

3.     Plaintiffs tried to remedy their toxic work environment by alerting McDonald's employees higher up the corporate ladder, to no avail.  Plaintiffs also presented to their General Manager a petition that sought to make their concerns known and to encourage McDonald's to take action to remedy the racist environment.  Not only were Plaintiffs' concerns ignored, but after they reported them, Plaintiffs were punished for speaking out.  McDonald's cut Plaintiffs' work hours, presenting a serious threat to their economic security.  McDonald's subjected Plaintiffs to trumped up disciplinary charges, putting at risk their employment and further contributing to a work environment characterized by differential treatment of and disrespect toward Black employees.

McDonald's also obstructed Plaintiffs' anticipated promotions, and instead gave them poor performance reviews despite exemplary performance.

4.      This lawsuit is not the first time McDonald's has confronted claims of race discrimination and a failure of accountability throughout the organization.  Even when Black employees rise to the level of executive leadership, they report differential treatment and demotion for speaking out.[1]  A recent lawsuit alleges that, even at the top of the company, Black employees are passed over for less-qualified white employees, unjustly demoted, subjected to racial slurs without recourse, and retaliated against by McDonald's when they advocate on behalf of Black franchisees or protest the disproportionate reduction in Black senior executives.  The predictable result of this pervasive racism is that the number of Black executives at the level of vice president or higher fell from 42 to seven between 2014 and 2019.  The lawsuit further alleges that McDonald's stopped cultivating relationships with Black franchisees—with the result that nearly one of every three Black franchisees left the company during that same time period—and scaled back its outreach to Black customers, resulting in a sharp decline in the percentage of McDonald's customers who are Black.  McDonald's franchised restaurants have also faced accusations of egregious, racist misconduct, including the

_____

[1] *See, e.g.*, Robert Channick, *Two African American Executives Sue McDonald's for Alleged Racial Discrimination*, Chi. Tribune (Jan. 8, 2020), https://www.chicagotribune.com/business/ct-biz-mcdonalds-racial-discrimination-lawsuit-20200108-avvfselojzdrzhoqeri2octrfq-story.html (describing a lawsuit filed in January 2020 by two African American McDonald's executives alleging pervasive discrimination at the company including racial slurs, demotion of African American executives, and retaliation for speaking out on behalf of African American franchise owners); *see also* Complaint, *Guster-Hines v. McDonald's USA, LLC*, No. 1:20-cv-00117 (N.D. Ill. Jan. 7, 2020).

firing of Black employees because a manager concluded "there were too many black people" at certain restaurants—conduct which McDonald's corporation failed to address.[2]

5.      The current situation at the corporate owned and operated McDonald's restaurant in Lakeland, Florida is thus not an isolated incident, but is instead symptomatic of a pattern or practice of McDonald's corporate leadership's failure to address pervasive racism and anti-Black sentiment throughout the organization.

6.      And yet McDonald's pays lip service to civil rights through glossy public relations campaigns.  For example, on June 3, 2020, McDonald's launched an advertising campaign that states: "Today we stand with Black communities across America.  Which is why we're donating to the National Urban League and the NAACP.  We do not tolerate inequity, injustice, or racism.  Black lives matter."

7.      While donating to worthy civil rights organizations to garner favorable publicity, McDonald's has failed to address racism in its own stores.  The facts alleged herein demonstrate that McDonald's does not actually stand with its own Black workers and customers, but instead subjects them to severe and pervasive discrimination, and punishes them when they dare to complain about the blatantly unequal treatment.

8.      While not unique, the experiences of Ms. Scott, Mr. Moody, and Ms. Booker are particularly egregious examples of the serious harm that occurs when a corporation fails to take responsibility for the discriminatory conduct of its managers and

---

[2] Wesley Lowery, *Fired McDonald's Workers Say They Were Dismissed for Being Minorities*, Wash. Post (Jan. 22, 2015), https://www.washingtonpost.com/news/post-nation/wp/2015/01/22/fired-mcdonalds-workers-say-they-were-dismissed-for-being-minorities/.

thus permits an environment of pervasive and intentional racial discrimination to take hold at one of its corporate owned and operated restaurants.

9.     Plaintiffs file this action to secure and vindicate their right to be free from racially discriminatory treatment in the terms and conditions of their employment contract, under the Civil Rights Act of 1866, 42 U.S.C. §1981 ("Section 1981").  The conduct complained of also violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* ("Title VII") and the Florida Civil Rights Act of 1992, Fla. Stat. §760.10 ("FCRA").  Plaintiffs are concurrently filing charges of discrimination with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations, and will amend this complaint to add Title VII and FCRA claims after they have exhausted their administrative remedies.

10.     To remedy McDonald's violation of their civil rights, Plaintiffs seek back pay and other damages to compensate them for the losses caused by race discrimination and retaliation, reinstatement of their hours to pre-retaliation levels, and injunctive relief forcing McDonald's to comply with this nation's civil rights laws and to respect the rights of their Black customers and employees.

## PARTIES

11.     Plaintiff Monica Scott is a 34-year-old Black woman and a resident of Lakeland, in Polk County, Florida.  Ms. Scott currently works at the Walt Loop McDonald's Restaurant as a crew member.

12.     Plaintiff Augusta "Gus" Moody is a 33-year-old Black man and a resident of Lakeland, in Polk County, Florida.  Mr. Moody currently works at the Walt Loop McDonald's Restaurant as a crew member.

13.     Plaintiff Faith Booker is a 32-year-old Black woman and a resident of Lakeland, in Polk County, Florida.  Ms. Booker currently works at the Walt Loop McDonald's Restaurant as a crew member.

14.     Defendant McDonald's Corporation is a Delaware corporation that has its principal place of business in Chicago, Illinois, and operates restaurants in all 50 states, including the Walt Loop McDonald's Restaurant.

15.     Defendant McDonald's USA, LLC ("McDonald's USA") is a Delaware limited liability company that has its principal place of business in Chicago, Illinois, and operates restaurants in all 50 states, including the Walt Loop McDonald's Restaurant. McDonald's USA is a wholly-owned subsidiary of McDonald's Corporation.

16.     Defendant McDonald's Restaurants of Florida, Inc. ("McDonald's Restaurants of Florida") is a Florida profit corporation that has its principal place of business in Chicago, Illinois, and operates McDonald's restaurants throughout Florida, including the Walt Loop McDonald's Restaurant.  McDonald's Restaurants of Florida is a wholly-owned subsidiary of McDonald's USA.

17.     The Florida corporate registrations for McDonald's Corporation, McDonald's USA, and McDonald's Restaurants of Florida reflect that all three entities share the same principal place of business, McDonald's headquarters at 110 N. Carpenter Street, Chicago, IL 60607-2101, and share many of the same officers.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this matter under 28 U.S.C. §§1331

(federal question) and 1343(a) (civil rights and elective franchise) based upon Plaintiffs'

claims under 42 U.S.C. §1981.

19.     Venue is proper in the Middle District of Florida, Tampa Division under

28 U.S.C. §1391 because a substantial part of the acts and omissions complained of

occurred in the Walt Loop McDonald's Restaurant in Polk County, which is located in

this District and served by this Division.

## FACTUAL ALLEGATIONS

**A.**     **McDonald's Owns, Operates, and Is Responsible for the Work Environment of the Walt Loop McDonald's Restaurant**

20.     McDonald's Corporation, McDonald's USA, and McDonald's Restaurants

of Florida comprise a single integrated enterprise that owns and operates the Walt Loop

McDonald's Restaurant and employs the workers at the restaurant.

21.     As a single integrated enterprise, the Defendants jointly control the

working conditions of employees at McDonald's corporate owned and operated

restaurants, including the Walt Loop McDonald's Restaurant, and including with respect

to Human Resources policies, the physical work environment, required worker and

manager training, and hiring, discipline, transfer, and firing of workers, among others.

22.     Employees at McDonald's headquarters are responsible for McDonald's

corporate owned and operated restaurants from a Human Resources perspective,

including ensuring that all HR practices, principles, and procedures are followed and

applied effectively.  Regional Human Resources Representatives, who provide Human

Resources direction in the field to restaurant managers, and the Regional Managers who supervise multiple stores, themselves partner with the Corporate Legal Department.

23.     Specific employment practices such as hiring and candidate screening, employee orientation, training, benefits, and management structures are developed and set by employees at headquarters, and mandated throughout corporate owned and operated restaurants, including the Walt Loop McDonald's Restaurant.

24.     McDonald's controls these restaurants by conducting regular audits to ensure compliance with company employee practices.  In addition, furthering this system of centralized control and decision-making is a reporting chain regarding the operations of corporate owned and operated restaurants that goes all the way up to senior and management employees at headquarters.

25.     Together, all Defendants operated the McDonald's corporate owned and operated Walt Loop McDonald's Restaurant during the relevant period and jointly employed all workers there, including Plaintiffs and managers, as well as higher-level supervisors and Human Resources Representatives with authority over multiple stores in Florida.

26.     McDonald's Corporation, McDonald's USA, and McDonald's Restaurants of Florida are jointly liable for their failure to prevent and remediate the acts of discrimination and retaliation complained of herein.

B.     **The Racially Hostile Work Environment Established by the General Manager at the Walt Loop Restaurant and Condoned by McDonald's**

27.     A new General Manager became the supervisor of the Walt Loop McDonald's Restaurant in or around October 2019.  The General Manager supervises all

employees at the Walt Loop McDonald's Restaurant, including Plaintiffs.  The General

Manager is responsible for hiring, training, promoting, evaluating, and disciplining

employees, including Plaintiffs.  The General Manager also sets the work schedules for

all employees, including Plaintiffs, which involves determining the number of hours

worked, the time of day worked, and whether and when employees may take vacation

days.

28.     Since she arrived at the Walt Loop McDonald's Restaurant, the General

Manager has engaged in severe and pervasive harassment of Black employees and

customers, in violation of Section 1981 of the Civil Rights Act of 1866.

29.     For example, on or around March 10, 2020, Ms. Scott was taking orders at

the drive-through window with another employee, serving a customer who was a Black

woman.  The customer requested grape jelly and ketchup to accompany an order of a

sausage biscuit and hash browns.  The General Manager said to Ms. Scott that, "It's

always Black people who want free stuff."  She followed up by stating that Black people

are "aggressive and trying to fight," and that "all they want to do is smoke weed."

30.     One of the employees who overheard the General Manager's comments

confronted the General Manager and pointed out that, just moments before, the General

Manager had no objection when a white customer had requested extra sauce.  The

General Manager shook her head and walked away.

31.      Between approximately April 22 and May 5, 2020, the Walt Loop

McDonald's Restaurant hosted a promotion that provided free meals to front-line

workers—e.g., health care workers, police officers, firefighters, and paramedics—responding to the COVID-19 pandemic.

32.     Throughout that promotion, the General Manager consistently required only Black front-line workers to show their employment badges in order to receive a free meal.  The General Manager gave free meals to non-Black customers without requiring that they show proof that they were front-line workers.

33.     On or about July 6, 2020, a Black customer became upset about how her order was handled.  The General Manager refused to engage with the customer and refused to give the General Manager's name.  The customer raised her voice and stated that she would report the store to corporate headquarters, but she did not say or do anything threatening.  The General Manager responded by calling the police.  The General Manager later said that it would not matter if the customer called corporate headquarters, because the call would be routed back to the store.

34.     The General Manager's handling of the July 6, 2020 customer complaint is in complete contrast to how the General Manager acts when non-Black customers become upset about their orders.  In those cases, the General Manager follows McDonald's policy to mollify the customer and make it right, such as by offering a free cookie or super-sizing the customer's order.

35.     The General Manager often requires Black crew members to sweep and mop the floor of the store, even though McDonald's employs a maintenance person for this purpose.  The General Manager does not assign non-Black crew members to sweep

and mop the store, but limits their cleaning responsibilities to their own work areas such as tables where they prepare food.

36.     The General Manager administers the system governing time off for employees at the Walt Loop McDonald's Restaurant in a manner that discriminates against Black employees.  Employees at the Walt Loop McDonald's Restaurant request time off by writing their request in a book maintained by the General Manager.  Although the General Manager has stated that the policy is that the first few workers to ask for time off will receive the time off, this often does not occur in practice.  The General Manager often denies time-off requests from Black employees, while allowing non-Black employees to take time off, even when they request the time off later than the Black employees.

37.     When Black workers are not granted their time-off requests and then are unable to report to work on the day they requested off, they are marked as "no-call/no-show" and subject to discipline.  For example, on information and belief, when a Black employee requested time off approximately a week in advance to attend a funeral in mid-July, was denied the day off, and then decided to attend the funeral, the Black employee was suspended.  When non-Black workers do not report to work on days they have requested off but that were not approved, they are not subject to discipline or are disciplined less harshly.

38.     The General Manager is more critical of Black workers than non-Black workers engaging in the same conduct.  For example, on one recent occasion, Mr. Moody's shirt had become untucked, and the General Manager immediately directed him

to tuck it in.  Even though a non-Black employee was standing nearby with an untucked

shirt, the General Manager did not say anything to the non-Black employee.  When Mr.

Moody pointed this out, the General Manager snapped at him, saying that he was not a

manager.

39.     Black workers raised their concerns about the General Manager's racist

comments and conduct to their Human Resources Representative and Regional Manager,

both of whom are corporate McDonald's employees responsible for supervising multiple

McDonald's corporate-owned restaurants.  Those corporate representatives refused to

take any action to redress the hostile work environment created by the blatant

discrimination towards Black customers and the intolerable working conditions under

which Black workers labor at the Walt Loop McDonald's Restaurant, explaining that

because this particular General Manager runs a very profitable store, nothing would be

done.  In short, McDonald's placed profitability over respect for the lives and well-being

of its Black workers and customers.

40.     Since the current General Manager started, one of three Black managers

has left the store and, on information and belief, another has been demoted.

**C.     Plaintiff Monica Scott**

41.     Ms. Scott has worked at McDonald's restaurants for a total of

approximately four years.  She has worked at the Walt Loop McDonald's Restaurant

since October 2019.  Prior to working at the Walt Loop Restaurant, she worked at two

different corporate-owned McDonald's restaurants in Auburndale, Florida.  When she

began her employment with McDonald's restaurants, she hoped she would become a

manager.  While working at the Auburndale stores, Ms. Scott received consistently favorable evaluations and was repeatedly provided periodic raises.  She was not subject to any discipline.

42.     The General Manager directed to Ms. Scott her comments on or about March 10, 2020 that, "it's always Black people who want free stuff," that Black people are "aggressive and trying to fight," and that "all they want to do is smoke weed."

43.     The General Manager's racist comments about Black people were extremely upsetting to Ms. Scott.  When Ms. Scott first heard the comments, she could not think and could not concentrate on the order she was attempting to take over her headset, and instead had to ask the customer to repeat the order.  She felt like a person with no clothes.  She choked up, and took a break as soon as possible.

44.     Later that day, in the break room, Ms. Scott confronted the General Manager about her racist comments, telling her that her comments were not fair, that the comments had hurt her, and that the General Manager had not made similar comments when non-Black customers made the same requests.  The General Manager pretended to apologize, but instead made more racist comments, stating "I am sorry if I offended you, but you know what I say is true."

45.     In the meantime, Ms. Scott observed that the General Manager also treated other Black customers differently than non-Black customers.  For example, during a promotional give-away of free meals to front-line workers, the General Manager provided free meals to non-Black front-line workers without question, but demanded identification before providing free meals to Black front-line workers.  It was extremely

distressing to Ms. Scott to see that the General Manager treated even front-line workers like nurses with disrespect, just because they were Black.

46.     Ms. Scott was initially afraid to raise her concerns about the General Manager with anyone else.  But in or around late April 2020, Ms. Scott summoned the courage to contact the Regional Manager in charge of the Walt Loop McDonald's Restaurant, to report the General Manager's comments.  The Regional Manager did nothing to address the concerns Ms. Scott raised.

47.     Ms. Scott also sought to contact "corporate" to register her complaint. Unsure of whom to contact, she called the number on McDonald's drink cups provided to customers.  The person who answered told her that the number she had called was for customer complaints, not employee complaints, but that she would connect her to someone who could help.  Ms. Scott was connected to the Human Resources Representative who oversees the Walt Loop McDonald's Restaurant, and left a voicemail describing the General Manager's comments.  The Human Resources Representative never responded to Ms. Scott's phone call.  Not long after Ms. Scott's call to Human Resources, however, the Human Resources Representative whose voicemail Ms. Scott reached was in the Walt Loop McDonald's Restaurant to address other issues at the store. The Human Resources Representative asked Ms. Scott about uniforms and equipment at the store but did not mention Ms. Scott's voicemail.  Ms. Scott took the initiative to follow up, raising with the Human Resources Representative in person her concerns about the General Manager's racist comments.

48.     The Human Resources Representative did not take Ms. Scott's concerns seriously.  Instead, the Human Resources Representative explained that she knows the General Manager outside of the workplace and said that the General Manager was not a racist.  She also explained that the General Manager was not going anywhere, because the General Manager's store was profitable.  The Human Resources Representative did nothing to remedy the concerns Ms. Scott raised.

49.     Since Ms. Scott raised her concerns with the General Manager, the Regional Manager, and the Human Resources Representative, the General Manager has subjected Ms. Scott to a series of adverse employment actions.

50.     Approximately two days after Ms. Scott confronted the General Manager, the General Manager directed Ms. Scott to clean the ceiling tiles in the store, which is not part of Ms. Scott's (or any crew member's) ordinary job.  In fact, the maintenance person was present in the store and asked Ms. Scott what she was doing, because it was not Ms. Scott's job.  The General Manager then directed Ms. Scott to wipe down the walls, to sweep up the parking lot, and to clean trash out from underneath the grill on her knees, none of which are tasks that are ordinarily part of her or other crew members' job.  This work is generally done by a specifically assigned maintenance worker.

51.     Later that day or shortly thereafter, the General Manager required Ms. Scott to leave the break room while she was waiting for her ride to leave for the day, while permitting a non-Black employee to remain in the break room while waiting for the non-Black employee's ride.

52.     The General Manager significantly reduced the number of hours Ms. Scott was assigned to work in June 2020.  Ms. Scott had previously worked approximately 38-39 hours per week.  As of July 2020, Ms. Scott routinely works approximately 24 hours per week.  Ms. Scott is a mother and cannot afford to raise her children working only 24 hours per week.  She has been living with her three children and boyfriend in a motel room, with rent due weekly.  With fewer hours, she has been forced to cut back on how much she eats, to make sure she has enough for her children, and she has had to borrow money from family to cover expenses.  As a result of the retaliatory cuts to her hours, she has acquired a second job, which does not begin until later this month.

53.     Ms. Scott was told her hours were cut because of COVID-19, but the store has remained busy.  On information and belief, non-Black employees have continued to work full-time, that is, close to 40 hours a week.

54.     The Walt Loop McDonald's Restaurant has continued to hire new employees even as it has cut Ms. Scott's hours.  The Walt Loop McDonald's Restaurant has posted a "Now Hiring" sign in the window and is soliciting applications for crew member applications online.  New employees have also recently started work in the store.

55.     On or about June 18, 2020, Ms. Scott, Mr. Moody, Ms. Booker, and another employee at the Walt Loop McDonald's Restaurant signed a petition and delivered it to the General Manager at a time when it was not disruptive to store operations.  The General Manager at first grabbed the copy of the petition, and then when she realized what it was, she dropped it and said she did not want it.  The General

Manager then required Ms. Scott and those with her to leave the store premises and said

someone should call the police.

56.     The petition was entitled: "We believe in a Fair and Equal Workplace!"

The petition stated:

> Workplace unfairness breeds an environment of discrimination, distrust, friction
> and potential violence or legal action.  Employees who are treated unfairly aren't
> allowed to achieve workplace success to their fullest potential.  Allowing
> workplace unfairness to continue sends the message to employees that this type of
> behavior is acceptable. We demand management takes steps to keep all
> employees feeling respected and treated as equals while building a positive work
> environment.  We demand to meet with management to discuss the multiple
> issues of inequality and unfairness that currently plague our environment.

57.     No changes to the Walt Loop McDonald's Restaurant's operations or

McDonald's approach to issues of discrimination, inequality, and unfairness were made

in response to the petition.

58.     The General Manager has continued to subject Ms. Scott to adverse

employment actions, including discipline without justification.

59.     When Ms. Scott reported to work the day after she had presented the

petition to the General Manager, the General Manager required her to sweep and mop the

premises, which she did.  While Ms. Scott was working the front counter and had a line

of customers, the General Manager required her to clean the garbage cans, something the

General Manager had never asked Ms. Scott to do before, and which is ordinarily the job

of the maintenance person, not a crew member.

60.     Ms. Scott has always been an exemplary worker, and prior to working for

the current General Manager, she received positive reviews and periodic raises.  In early

July 2020, the current General Manager gave Ms. Scott a performance review with

twelve "zeros" for deficient performance.  Ms. Scott was extremely discouraged by this review, which was inconsistent with her performance, commitment to her job, and her prior reviews, and which adversely affected her ability to receive a raise.

61.     The General Manager and the Regional Manager who were providing Ms. Scott with her performance review also asked her to sign a document disclaiming the petition she had submitted with her colleagues.  Ms. Scott refused to sign, and the Managers refused to provide her with a copy of the document they had asked her to sign. Ms. Scott was then disciplined with a "no-call/no-show" for an earlier absence, one for which she had a doctor's note.

62.     On July 8, 2020, as the COVID-19 pandemic continued to surge, Ms. Scott called in approximately two hours and fifteen minutes before her shift was to start to report that she was not feeling well.  McDonald's requires employees who call out sick to provide two hours' notice.  Ms. Scott has asthma and was having an asthma attack on that date, as she explained to one of the more junior store managers when she called in. Ms. Scott waited until just before the required time period to call in because she was hoping to be able to work her shift (and thus not to lose the necessary income), but she was diligent, and even set an alarm at 5:15 a.m. to ensure she provided the requisite notice in accordance with McDonald's policy.  When Ms. Scott reported to work on July 9, 2020, the General Manager wrote up Ms. Scott for not calling out early enough the previous day, although she had fully complied with the sick leave notice policy.  When she provided proof that she had called in more than two hours before her shift, the

General Manager then said Ms. Scott hadn't explained why she needed to stay home, although she had.

63. The Regional Manager also wrote up Ms. Scott on July 9, 2020 without any basis. The Regional Manager told Ms. Scott that he had seen her on camera dumping garbage in the parking lot. Ms. Scott asked to see the video and was shown a picture of her getting into her car, but the Regional Manager did not show her any video footage. Ms. Scott tried to explain that she had not dumped garbage in the parking lot, and that she was not even on the premises on July 8, 2020, because she had called out sick. The Regional Manager nevertheless wrote up Ms. Scott. Ms. Scott was told that this warning was her final written warning, and that if she receives further discipline, she will be subject to termination. Ms. Scott was very hurt that management would think she would do something like dump garbage in the parking lot, since she takes her job seriously and cares greatly about respecting her workplace, fellow workers, and customers.

64. After Ms. Scott submitted the petition, the General Manager began directing Ms. Scott to clock out when using the restroom, even though employees are not supposed to clock out when they use the restroom.

65. In early July 2020, Ms. Scott, Mr. Moody, and Ms. Booker had clocked out for the day and were having a conversation in the parking lot. The General Manager yelled at Plaintiffs, telling them they were soliciting, and required them to leave the premises immediately. Ms. Scott has not observed the General Manager reacting this way when non-Black employees have conversations after work in the parking lot.

66. Shortly after she began work at the Walt Loop McDonald's Restaurant, the Regional Manager told Ms. Scott that he wanted her to be in the management class. She rearranged her schedule so she could attend the management class and was told she would be made a swing manager, a position that pays more and has additional benefits like paid time off. As a result of the General Manager's racist comments to Ms. Scott while working at the drive-through window, which occurred shortly before Ms. Scott was to attend the management class, Ms. Scott felt she could no longer pursue the promotion. She explained to the General Manager that she did not feel comfortable working under her leadership as a manager if she felt that way about Black people.

67. The General Manager has rejected Ms. Scott's time off requests in favor of those of non-Black employees, even when Ms. Scott had requested the time off earlier. For example, approximately one month before the Fourth of July, Ms. Scott requested time off for that weekend by writing her request for days off on July 3 and July 6 in the book maintained by the General Manager. She observed that there was only one prior request in the book for that time off. The General Manager nevertheless denied Ms. Scott's request and scheduled her for July 3. A non-Black employee asked a few days in advance for the same day off that Ms. Scott had previously requested, and the non-Black employee was granted the day off.

68. Ms. Scott has suffered extreme emotional distress as a result of the foregoing behavior, including feeling terrible at work, where she feels that management looks at her like trash. She has experienced sleeplessness, anxiety, headaches, and crying because of her toxic work environment and the retaliation she has faced. Ms. Scott is

under constant stress regarding providing for her family as a result of her reduced hours, and feels ashamed at having to tell her children that she cannot take them to certain activities because she can no longer afford to do so.  She feels like she has lost the energy to play with her children, and she feels awful when her children ask her what is wrong but she cannot tell them, because she does not want them to worry.  It is "wearing on [her] heart" that her General Manager has the opinions about Black people she has expressed, and she feels like she is being tossed around with no power to remedy the situation because her efforts to improve her workplace for herself and others have been blocked.

> **D.** **Plaintiff Augusta Moody**

69.     Mr. Moody has worked at the Walt Loop McDonald's Restaurant for approximately one year.

70.     Mr. Moody was made aware of the General Manager's comments to Ms. Scott that Black people want things for free, are "aggressive," and only "want to smoke weed."  He has observed the General Manager discriminating against Black customers, including by requiring only Black front-line workers, but not other front-line workers to present identification in order to receive promotional meals.  He was also present when the General Manager called the police on a Black customer who was complaining about an issue at the restaurant in a non-threatening manner.  Seeing the great disrespect with which the General Manager treats Black customers makes Mr. Moody feel frustrated and hopeless.

71.     Mr. Moody has registered complaints with the Regional Manager and the Human Resources Representative regarding the General Manager's racist comments and differential treatment of Black workers and Black customers.  Neither the Regional Manager nor the Human Resources Representative made any changes to address the issues regarding racist comments or conduct Mr. Moody raised.  The Human Resources Representative made clear that the General Manager was not going anywhere because management was satisfied with the profitability of the store, so told him he could transfer to a different McDonald's store if he had a problem with the way the Walt Loop Restaurant was managed.  Mr. Moody found this very discouraging, as he understood that nothing about McDonald's racist culture was going to change.  He didn't want to just abandon other Black workers at the Walt Loop McDonald's Restaurant; rather, he wanted to create positive change.  It would also be difficult for him to change stores, as he does not have reliable access to transportation.

72.     After Mr. Moody registered his complaints with Human Resources, the General Manager reduced Mr. Moody's hours substantially.  Prior to June 2020, Mr. Moody regularly worked five days per week, typically for 37-39 hours.  His weekly hours then sharply declined.  During the week of July 6, 2020, for example, he was scheduled to work 22 hours, and during the week of July 13, he was scheduled to work 23 hours.  Mr. Moody, like Ms. Scott, was told his hours were being reduced as a result of the COVID-19 pandemic, but the Walt Loop McDonald's Restaurant remains busy and appears to be hiring new employees.  On information and belief, non-Black employees continue to work close to 40 hours per week.

73.     McDonald's reduction of Mr. Moody's hours, and the subsequent unpredictability, have caused Mr. Moody severe anxiety, as he knows he must still pay for food, lodging, gas, and phone bills, and find a way to provide for his family on less.

74.     Mr. Moody, along with Ms. Scott, Ms. Booker, and another employee, signed the petition advocating for a fair and equal workplace, and requesting to meet with management, and delivered that petition to the General Manager on or about June 18, 2020.  Like Ms. Scott, he was required to leave the premises upon submitting the petition.

75.     Mr. Moody has also been subjected to baseless or disproportionately severe discipline.

76.     On or about May 26, 2020, Mr. Moody told a non-employee that the non-employee could not stand in the worker area of the restaurant.  The General Manager gave Mr. Moody a three-day suspension, saying he was acting aggressively and stood too close to the non-employee in light of COVID-19.  Mr. Moody contacted the General Manager and Regional Manager about the unfair suspension.  Two days after he was sent home, he was contacted by the Regional Manager, who said the Regional Manager had reviewed the video and understood now that there was no reason for him to be suspended. He was permitted to return to work the next day.  The Human Resources Representative later followed up with Mr. Moody about this incident, but Mr. Moody was never paid for the time he was unable to work as a result of the unfair suspension.

77.     On another day, Mr. Moody was seven minutes late for a 7:30 a.m. shift. The General Manager had scheduled Mr. Moody for a 7:30 a.m. shift even though Mr. Moody had listed his availability as 8:00 a.m.  It is McDonald's policy for managers to

take into account crew members' availability when preparing schedules, and crew members should not be scheduled to work when they are not available.  It is difficult for Mr. Moody to arrive before 8:00 a.m., because he carpools with another person whose schedule does not permit him to arrive before 8:00 a.m.  The General Manager wrote Mr. Moody up for tardiness, even though Mr. Moody had clearly communicated this constraint on his availability.

78.     That same day, Mr. Moody asked the General Manager to repeat something she said because the room was noisy and he could not hear her.  The General Manager then wrote him up a second time in the same day, for insubordination.

79.     Not long thereafter, Mr. Moody was working the grill alone during peak hours.  It was so busy that Mr. Moody was having difficulty keeping up, and requested help, which is typically granted, especially during peak.  Instead of assisting Mr. Moody, the General Manager sent him home and told him he was unable to do his job.  Mr. Moody was not paid for the remainder of his shift.

80.     On or about July 3, 2020, Mr. Moody called in sick in accordance with McDonald's policy.  When he arrived for work the following Monday, July 6, 2020, the General Manager asked him for a doctor's note, which is not standard procedure for a one-day absence, and stated that she would write him up for a no-call/no-show on July 3, even though he had called out sick as required by McDonald's policy.

81.     On or about July 7, 2020, Mr. Moody saw that he was again scheduled to work a 7:30 a.m. shift.  When he asked the General Manager to change his schedule to

reflect his availability, she refused.  Mr. Moody raised the scheduling issue with the

Regional Manager, who changed the schedule to reflect Mr. Moody's availability.

82.     On July 8, 2020, Mr. Moody was scheduled to work a shift beginning at

8:00 a.m. and ending at 2:15 p.m.  Upon arriving at the Walt Loop McDonald's

Restaurant for his shift, he was told by the General Manager he could not clock in for his

shift until 9:15 a.m.  Because the General Manager prevented him from clocking in for

his shift, Mr. Moody was forced to forego his wages for an hour and fifteen minutes he

had been scheduled and prepared to work.

83.     Mr. Moody was present with Ms. Scott and Ms. Booker in early July

2020, when the General Manager left the restaurant to record Plaintiffs' conversation in

the parking lot after work hours, accused them of soliciting, and required them to leave

the premises.

84.     Mr. Moody was later approached by the Regional Manager and given a

write-up saying that Mr. Moody had been outside loitering with his colleagues and that

they were not allowed to do so for their own safety, because of COVID-19.  Non-Black

employees sometimes speak to each other in the parking lot after work, and, on

information and belief, are not told to leave.

85.     Until recently, Mr. Moody was on track to become a crew trainer.  Crew

trainers are paid more than crew members.  The Human Resources Representative asked

Mr. Moody whether he was interested in handling more responsibilities and earning more

money, and said she would talk to his General Manager about the promotion.  The

General Manager then provided him with a book to study for the assessment for the crew trainer position and started his training.

86.     In stark contrast to a couple months ago, when Mr. Moody was told by Human Resources he was in line for a promotion to crew trainer, the General Manager recently gave Mr. Moody a very poor performance evaluation.  This evaluation, which adversely affected his ability to receive a raise, was provided after he and his colleagues had submitted the petition seeking equal treatment for Black workers to the General Manager.  Mr. Moody was not promoted; he learned shortly after his review that two non-Black employees were given the crew trainer positions instead.

87.     Mr. Moody has suffered severe emotional distress as a result of the foregoing.  He feels discouraged that his efforts to address racist treatment of Black customers and discrimination against Black employees have not been taken seriously or resulted in any changes to his workplace.  Mr. Moody also feels tremendous stress resulting from the constant barrage of disproportionate discipline and reduction of hours that threaten his ability to pay for his living expenses and provide for his family.

**E.     Plaintiff Faith Booker**

88.     Ms. Booker has worked at the Walt Loop McDonald's Restaurant since October 2018.

89.     Ms. Booker has heard the General Manager say to groups of colleagues that Black people are lazy and always want things for free.

90.     Ms. Booker has spoken with the Regional Manager and Human Resources Representative about the General Manager's racist behavior and comments, but neither

the Regional Manager nor the Human Resources Representative took any steps to remedy the situation.

91.     Ms. Booker was present when the General Manager recently called the police on a Black customer who raised her voice but was not in any way threatening.

92.     Ms. Booker signed the petition regarding fair and equal workplace treatment that was submitted by her colleagues to the General Manager.

93.     After Ms. Booker submitted the petition, the General Manager cut Ms. Booker's hours.  Ms. Booker previously worked five days a week.  In June, she was reduced to three days per week and is now regularly scheduled for only two days per week.  She has been told her reductions in hours are due to COVID-19, but has observed that the Walt Loop McDonald's Restaurant remains busy and appears to be hiring new employees.  On information and belief, non-Black employees are still scheduled to work for close to 40 hours per week.

94.     Ms. Booker spoke with the Human Resources Representative after submitting the petition.  Ms. Booker described her concerns, including regarding her hours being cut, but the Human Resources Representative downplayed those concerns and said that the General Manager would not do or say what Ms. Booker said she had.

95.     Ms. Booker was conversing with Ms. Scott and Mr. Moody in the parking lot in early July 2020 when the General Manager left the restaurant, began recording Plaintiffs, loudly accused them of soliciting, and required them to leave the premises immediately.

96.     Ms. Booker was later approached by the Regional Manager, who brought her a piece of paper he wanted Ms. Booker to sign saying that she had been outside loitering with her colleagues and that they were not allowed to do so for their own safety, because of COVID-19.  The paper further stated that if she could not follow that rule, she would be terminated.  Ms. Booker refused to sign the paper and asked for a copy of the document, but was not provided one.

97.     Ms. Booker has always been an exemplary worker and has not previously been subject to discipline, other than in connection with time off that was discriminatorily denied.

98.     Ms. Booker has suffered severe emotional distress as a result of the foregoing, including dreading going to work every day.  Ms. Booker has five children and works two jobs to provide for her family.  McDonald's dramatic cut to her work schedule imperils her ability to pay for her living expenses and meet her family's needs. She is exhausted from handling two jobs, and from the uncertainty of not knowing what racist and retaliatory behavior she will face in her workplace.

## CAUSES OF ACTION

### COUNT 1 – 42 U.S.C. §1981:  DISCRIMINATION ON THE BASIS OF RACE; HOSTILE WORK ENVIRONMENT AND DISPARATE TREATMENT

99.     Plaintiffs re-allege and incorporate by reference paragraphs 1-98 of this Complaint as though set out here word for word.

100.    McDonald's intentionally engaged in discriminatory conduct because of Plaintiffs' race.

101.    In particular, McDonald's failed to provide Plaintiffs with time off on the same terms as time off was provided to non-Black employees, subjected Plaintiffs to harsher discipline than non-Black employees, and failed to promote Plaintiff Moody even though he had equal or better qualifications than non-Black employees who were promoted.

102.    McDonald's also subjected Plaintiffs to severe and pervasive harassment based on their race that altered Plaintiffs' working conditions and created a hostile working environment.

103.    Despite having actual and constructive knowledge of the hostile work environment to which Plaintiffs are being subjected, McDonald's has failed to take immediate and appropriate corrective action to stop it.

104.    Consequently, McDonald's violated Plaintiffs' right to make and enforce contracts and receive the full and equal benefit of the law as guaranteed by 42 U.S.C. §1981.

105.    McDonald's knew or should have known that its actions constituted unlawful race discrimination, including hostile work environment and other disparate treatment, and showed malicious and/or reckless disregard for Plaintiffs' statutorily protected rights.

106.    As a direct result of McDonald's discriminatory acts, Plaintiffs are entitled to damages including, but not limited to:

        a.    Past and future lost wages and benefits;

        b.    Compensation for past and future physical and emotional distress;

    c.   Punitive damages;

    d.   Attorneys' fees and costs; and

    e.   Pre-judgment interest.

107.    As a direct result of McDonald's discriminatory acts, Plaintiffs are also entitled to declaratory and injunctive relief, as set forth in detail in the Prayer for Relief.

**COUNT 2 – 42 U.S.C. §1981: DISCRIMINATION ON THE BASIS OF RACE; RETALIATION**

108.    Plaintiffs re-allege and incorporate by reference paragraphs 1-107 of this Complaint as though set out here word for word.

109.    Plaintiffs engaged in activities protected under 42 U.S.C. §1981 and other civil rights statutes when they registered complaints with the Regional Manager and Human Resources Representative regarding racist conduct occurring at the Walt Loop McDonald's Restaurant.  They likewise engaged in activity protected under 42 U.S.C. §1981 and other civil rights statutes when they circulated and submitted to the General Manager a petition in support of a fair, equal, and non-discriminatory workplace.

110.    McDonald's violated 42 U.S.C. §1981 when it, through the General Manager, took materially adverse employment actions against Plaintiffs with the purpose of retaliating against them because of their participation in protected activities and opposition to race discrimination, including a hostile work environment, disparate treatment of Black employees, and disparate treatment of Black customers.

111.    McDonald's knew or should have known that its actions constituted unlawful retaliation and showed malicious and/or reckless disregard for Plaintiffs' statutorily protected rights.

112.    As a direct result of McDonald's retaliatory acts, Plaintiffs are entitled to damages including, but not limited to:

        a.    Past and future lost wages and benefits;

        b.    Compensation for past and future physical and emotional distress;

        c.    Punitive damages;

        d.    Attorneys' fees and costs; and

        e.    Pre-judgment interest.

113.    As a direct result of McDonald's discriminatory acts, Plaintiffs are also entitled to declaratory and injunctive relief, as set forth in detail in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court provide Plaintiffs with the following relief:

A.    Judgment in favor of Plaintiffs and against McDonald's for violation of 42 U.S.C. §1981;

B.    A declaration that the actions of McDonald's constitute unlawful race discrimination;

C.    An injunction requiring McDonald's to remedy the civil rights violations described herein, and to prevent future violations, by, among other things:

    i.    Reinstating Plaintiffs to a schedule of approximately 35-38 hours per week and enjoining the General Manager of the Walt Loop McDonald's Restaurant from reducing Plaintiffs' hours;

ii.     Requiring the removal of discriminatorily imposed discipline and negative performance reviews from McDonald's records regarding Plaintiffs;

iii.    Instructing the General Manager of the Walt Loop McDonald's Restaurant that racial discrimination towards Black customers and employees will not be tolerated and prohibiting the General Manager from engaging in such conduct;

iv.     Promoting Plaintiff Moody to Crew Trainer;

v.      Implementing a safe reporting mechanism including multiple channels for reporting race discrimination, and adequately communicating that reporting mechanism to all McDonald's employees;

vi.     Adopting and implementing practices to ensure that McDonald's employees who report race discrimination are not the subject of retaliation;

vii.    Requiring McDonald's to provide employees at the Walt Loop Restaurant with time off and job assignments in a manner that does not discriminate on the basis of race.

D.     Judgment in an amount that the Court or jury determines to be fair, just, and adequate compensation for the damages that Plaintiffs have sustained, past and future, together with interest;

E.      An award of punitive damages that the Court or jury determines to be fair

and sufficient to punish, penalize, and/or deter McDonald's from the

harmful acts alleged herein;

F.      An award of reasonable attorneys' fees and costs; and

G.      Any other relief that the Court deems appropriate.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury as to all those issues so triable as of right.

Dated: July 16, 2020                          Respectfully submitted,


/s/ Peter Helwig
Peter Helwig
Florida Bar No. 0588113
Harris & Helwig, P.A.
6700 South Florida Avenue, Suite 31
Lakeland, Florida 33813
Phone: 863-648-2958
Facsimile: 863-619-8901
pfhelwig@tampabay.rr.com

Eve H. Cervantez, Trial Counsel*
Amanda C. Lynch*
Altshuler Berzon LLP
177 Post St., Suite 300
San Francisco, CA 94108
Phone: 415-421-7151
Facsimile: 415-362-8064
ecervantez@altshulerberzon.com
alynch@altshulerberzon.com

Mary Joyce Carlson*
1130 Connecticut Ave. NW, Suite 950
Washington, DC 20036

Phone: 202-340-5756
mj@maryjoycecarlson.com

*Counsel for Plaintiffs*

*\*Specially appearing as counsel of record;
designation and consent-to-act forthcoming*