**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

MONICA SCOTT;
AUGUSTA MOODY; and
FAITH BOOKER,

               Plaintiffs,

v.

MCDONALD'S CORPORATION;
MCDONALD'S USA, LLC; and
MCDONALD'S RESTAURANTS OF
FLORIDA, INC.,

               Defendants.

Case No. 8:20-CV-01638-VMC-CPT

**FIRST AMENDED COMPLAINT**

**And Demand For Jury Trial**

## INTRODUCTION

1.      This is a civil rights action brought by Plaintiffs Monica Scott, Augusta "Gus" Moody, and Faith Booker, who seek redress for racial harassment, race discrimination, and retaliation at the hands of their employer, McDonald's Corporation, McDonald's USA, LLC, and McDonald's Restaurants of Florida, Inc. (together, "McDonald's" or "Defendants").  Since the Plaintiffs filed this action on July 17, 2020, Defendants have fired Ms. Scott and Mr. Moody, and disciplined Ms. Booker for things she did not do.  Plaintiffs file this Amended Complaint to bring these and other flagrant acts of retaliation to the attention of the Court, to address issues raised by Defendants in their Motion to Dismiss, and to add certain Title VII claims now that they have exhausted administrative remedies.

2.      Plaintiffs are Black.  McDonald's has subjected them and other Black employees of the corporate owned and operated McDonald's restaurant at 5525 Walt Loop Road in Lakeland, Florida ("the Walt Loop McDonald's Restaurant") to a racially hostile working environment and disparate treatment because of their race.  When Plaintiffs dared to complain about this mistreatment, McDonald's retaliated against them by reducing their hours, refusing to promote them, disciplining them, downgrading their performance evaluations (which precluded them from obtaining raises), assigning them deliberately demeaning tasks, and, in the case of Ms. Scott and Mr. Moody, terminating their employment.

3.      Nancy Veliz,[1] the General Manager of the Walt Loop McDonald's Restaurant ("General Manager"), disciplines Plaintiffs and other Black employees when they have done nothing wrong, disciplines Plaintiffs and other Black employees more harshly than employees who are not Black for the same offenses, and refuses to grant Plaintiffs and other Black employees requested time off, while allowing employees who are not Black to take time off as requested.  The General Manager treats Black employees and customers with contempt.  She makes racist comments about Black people, like "it's always Black people who want free stuff," Black people are "aggressive and trying to

---

[1] Plaintiffs did not identify General Manager Nancy Veliz by name in their original complaint, fearing further retaliation by her if she was subjected to moral opprobrium or other criticism as a result of being publicly called out in this lawsuit for her racist conduct.  Although McDonald's is well aware of the General Manager's name, McDonald's Motion to Dismiss Plaintiffs' original complaint criticized Plaintiffs for failure to specifically identify the General Manager.  Accordingly, in this First Amended Complaint Plaintiffs identify the General Manager, and all other managers who discriminated against them on the basis of race, by name, as McDonald's has requested.

fight," and "all they want to do is smoke weed."  When confronted about her comments, she has insisted they are true.  The General Manager even called the police on a Black customer when the customer complained about issues in the restaurant.  This pervasive racist environment causes Plaintiffs severe emotional distress and trauma.

4.     Plaintiffs tried to remedy their toxic work environment by alerting McDonald's employees higher up the corporate ladder, to no avail.  On Juneteenth—June 19, 2020—Plaintiffs also presented to their General Manager a petition that sought to make their concerns about racial discrimination known and to encourage McDonald's to take action to remedy the racist environment.  Not only were Plaintiffs' concerns ignored, but after they reported them, Plaintiffs were punished for speaking out.  After Plaintiffs complained to the General Manager and to higher level management about the race discrimination to which they were subjected, McDonald's cut Plaintiffs' work hours, presenting a serious threat to their economic security.  McDonald's subjected Plaintiffs to trumped up disciplinary charges, further contributing to a work environment characterized by differential treatment of and disrespect toward Black employees. McDonald's obstructed Plaintiffs' anticipated promotions, and instead gave them poor performance reviews that precluded them from obtaining raises, despite exemplary performance.  And, ultimately, after Ms. Scott and Mr. Moody filed the original complaint in this lawsuit and Charges with the Equal Employment Opportunity Commission ("EEOC") alleging racial discrimination and retaliation, McDonald's terminated their employment in retaliation for raising those concerns.

5.     This lawsuit is not the first time McDonald's has confronted claims of race discrimination and a failure of accountability throughout the organization.  Even when Black employees rise to the level of executive leadership, they report differential treatment and demotion for speaking out.[2]  A recent lawsuit alleges that, even at the top of the company, Black employees are passed over for less-qualified white employees, unjustly demoted, subjected to racial slurs without recourse, and retaliated against by McDonald's when they advocate on behalf of Black franchisees or protest the disproportionate reduction in Black senior executives.  The predictable result of this pervasive racism is that the number of Black executives at the level of vice president or higher fell from 42 to seven between 2014 and 2019  The lawsuit further alleges that McDonald's stopped cultivating relationships with Black franchisees—with the result that nearly one of every three Black franchisees left the company during that same time period—and scaled back its outreach to Black customers, resulting in a sharp decline in the percentage of McDonald's customers who are Black.

6.     Similarly, a recent race discrimination lawsuit filed by Black franchisees outlines McDonald's long and sordid history of discrimination against Black

_____

[2] *See, e.g.*, Robert Channick, *Two African American Executives Sue McDonald's for Alleged Racial Discrimination*, Chi. Tribune (Jan. 8, 2020), https://www.chicagotribune.com/business/ct-biz-mcdonalds-racial-discrimination-lawsuit-20200108-avvfselojzdrzhoqeri2octrfq-story.html (describing a lawsuit filed in January 2020 by two African American McDonald's executives alleging pervasive discrimination at the company including racial slurs, demotion of African American executives, and retaliation for speaking out on behalf of African American franchise owners); *see also* Complaint, *Guster-Hines v. McDonald's USA, LLC*, No. 1:20-cv-00117 (N.D. Ill. Jan. 7, 2020).

businesspeople:[3]  That complaint alleges Black franchise operators have consistently

been steered to restaurants in high-crime, poverty-stricken areas.  In 1984, Black

franchise owners complained that they were "confined to ghetto areas."  Again in the

1990's, McDonald's admitted that "for business reasons we thought valid at the time, the

Company has placed many Black Franchisees in restaurants that have not allowed them

to achieve the same level of economic success as their peers."  The complaint further

alleges that under current leadership McDonald's has continued its practice of

discriminating against Black franchise owners, including by "confining" them to "inner

cities or urban areas with higher costs" for security and maintenance.  The complaint

alleges that McDonald's "discriminatory practices and polices" led to a "cash flow gap

between Black franchisees in comparison to White franchisees" and a "mass exodus" of

Black franchisees from McDonald's.  Black franchisees are being forced out of

McDonald's in record numbers.

7.     Racism extends from the top of the company to the bottom.  McDonald's

franchise restaurants too have been accused of egregious, racist misconduct towards their

crew members.  For example, a franchise McDonald's restaurant in Virginia is alleged to

have fired Black employees because a manager concluded "there were too many black

people" at certain restaurants, and referred to Black workers as "ghetto."[4]  Similarly,

---

[3] *Crawford, et al v. McDonald's USA, LLC,* No.1:20-cv-05132 (N.D. Ill. August 31, 2020).

[4] Wesley Lowery, *Fired McDonald's Workers Say They Were Dismissed for Being Minorities*, Wash. Post (Jan. 22, 2015), https://www.washingtonpost.com/news/post-nation/wp/2015/01/22/fired-mcdonalds-workers-say-they-were-dismissed-for-being-minorities/.

Black workers at McDonald's franchise restaurants in North Carolina and Los Angeles have filed charges with the federal Equal Employment Opportunity Commission, alleging that McDonald's and its franchise restaurants failed to hire workers because they were Black, or that management called Black workers "ghetto" or said they wouldn't hire Black workers "because they are lazy."  McDonald's Corporate Defendants did nothing to remedy these racist and hostile work environments for Black employees.  Black crew members too are being forced out of McDonald's.

8.     The current situation at the corporate owned and operated McDonald's restaurant in Lakeland, Florida is thus not an isolated incident, but is instead symptomatic of a pattern or practice of McDonald's corporate leadership's failure to address pervasive racism and anti-Black sentiment throughout the organization.

9.     And yet McDonald's pays lip service to civil rights through glossy public relations campaigns.  For example, on June 3, 2020, McDonald's launched an advertising campaign that states: "Today we stand with Black communities across America.  Which is why we're donating to the National Urban League and the NAACP.  We do not tolerate inequity, injustice, or racism.  Black lives matter."

10.     While donating to worthy civil rights organizations to garner favorable publicity, McDonald's has failed to address racism in its own stores.  The facts alleged herein demonstrate that McDonald's does not actually stand with its own Black workers and customers, but instead subjects them to severe and pervasive discrimination, and punishes them when they dare to complain about the blatantly unequal treatment.

11.     While not unique, the experiences of Ms. Scott, Mr. Moody, and Ms. Booker are particularly egregious examples of the serious harm that occurs when a corporation fails to take responsibility for the discriminatory conduct of its managers and thus permits an environment of pervasive and intentional racial discrimination to take hold at one of its corporate owned and operated restaurants.

12.     Plaintiffs file this action to secure and vindicate their right to be free from racially discriminatory treatment in the terms and conditions of their employment contract, under the Civil Rights Act of 1866, 42 U.S.C. §1981 ("Section 1981"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e *et seq*. ("Title VII").  Plaintiffs have filed charges of discrimination with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations ("FCHR"), and will amend this complaint to add additional Title VII claims, as well as claims under the Florida Civil Rights Act of 1992, Fla. Stat. §760.10 ("FCRA"), after they have exhausted their administrative remedies.

13.     To remedy McDonald's violation of their civil rights, Plaintiffs seek back pay, front pay, and other damages to compensate them for the economic losses and emotional distress caused by race discrimination and retaliation, reinstatement of Ms. Scott and Mr. Moody's employment, reinstatement of Plaintiffs' hours to pre-retaliation levels, and injunctive relief forcing McDonald's to comply with this nation's civil rights laws and to respect the rights of their Black customers and employees.

**PARTIES**

14.     Plaintiff Monica Scott is a 34-year-old Black woman and a resident of Lakeland, in Polk County, Florida.  Ms. Scott worked at the Walt Loop McDonald's Restaurant as a crew member until September 27, 2020, when her employment was terminated.

15.     Plaintiff Augusta "Gus" Moody is a 33-year-old Black man and a resident of Lakeland, in Polk County, Florida.  Mr. Moody worked at the Walt Loop McDonald's Restaurant as a crew member until September 17, 2020, when his employment was terminated.

16.     Plaintiff Faith Booker is a 32-year-old Black woman and a resident of Lakeland, in Polk County, Florida.  Ms. Booker currently works at the Walt Loop McDonald's Restaurant as a crew member.

17.     Defendant McDonald's Corporation is a Delaware corporation that has its principal place of business in Chicago, Illinois, and operates restaurants in all 50 states, including the Walt Loop McDonald's Restaurant.

18.     Defendant McDonald's USA, LLC ("McDonald's USA") is a Delaware limited liability company that has its principal place of business in Chicago, Illinois, and operates restaurants in all 50 states, including the Walt Loop McDonald's Restaurant. McDonald's USA is a wholly-owned subsidiary of McDonald's Corporation.

19.     Defendant McDonald's Restaurants of Florida, Inc. ("McDonald's Restaurants of Florida") is a Florida profit corporation that has its principal place of business in Chicago, Illinois, and operates McDonald's restaurants throughout Florida,

including the Walt Loop McDonald's Restaurant.  McDonald's Restaurants of Florida is a wholly-owned subsidiary of McDonald's USA.

20.     The Florida corporate registrations for McDonald's Corporation, McDonald's USA, and McDonald's Restaurants of Florida reflect that all three entities share the same principal place of business, McDonald's headquarters at 110 N. Carpenter Street, Chicago, IL 60607-2101, and share many of the same officers.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this matter under 28 U.S.C. §§1331 (federal question) and 1343(a) (civil rights and elective franchise) based upon Plaintiffs' claims under 42 U.S.C. §1981 and 42 U.S.C. §§2000e *et seq.* (Title VII).

22.     Venue is proper in the Middle District of Florida, Tampa Division under 28 U.S.C. §1391 and 42 U.S.C. §2000e-5 because a substantial part of the acts and omissions complained of occurred in the Walt Loop McDonald's Restaurant in Polk County, which is located in this District and served by this Division.

## FACTUAL ALLEGATIONS

**A.     McDonald's Owns, Operates, and Is Responsible for the Work Environment of the Walt Loop McDonald's Restaurant**

23.     McDonald's Corporation, McDonald's USA, and McDonald's Restaurants of Florida comprise a single integrated enterprise that owns and operates the Walt Loop McDonald's Restaurant and employs the workers at the restaurant.

24.     As a single integrated enterprise, the Defendants jointly control the working conditions of employees at McDonald's corporate owned and operated restaurants, including the Walt Loop McDonald's Restaurant, and including with respect

to Human Resources policies, the physical work environment, required worker and manager training, and hiring, discipline, transfer, and firing of workers, among others.

25.     Employees at McDonald's headquarters are responsible for McDonald's corporate owned and operated restaurants from a Human Resources perspective, including ensuring that all HR practices, principles, and procedures are followed and applied effectively.  Regional Human Resources Representatives, who provide Human Resources direction in the field to restaurant managers, and the Regional Managers who supervise multiple stores, themselves partner with the Corporate Legal Department.

26.     Specific employment practices such as hiring and candidate screening, employee orientation, training, benefits, and management structures are developed and set by employees at headquarters, and mandated throughout corporate owned and operated restaurants, including the Walt Loop McDonald's Restaurant.

27.     McDonald's controls these restaurants by conducting regular audits to ensure compliance with company employee practices.  In addition, furthering this system of centralized control and decision-making is a reporting chain regarding the operations of corporate owned and operated restaurants that goes all the way up to senior and management employees at headquarters.

28.     Together, all Defendants operated the McDonald's corporate owned and operated Walt Loop McDonald's Restaurant during the relevant period and jointly employed all workers there, including Plaintiffs and managers, as well as higher-level supervisors and Human Resources Representatives with authority over multiple stores in Florida.

29.     McDonald's Corporation, McDonald's USA, and McDonald's Restaurants of Florida are jointly liable for their failure to prevent and remediate the acts of discrimination and retaliation complained of herein.

30.     Plaintiffs are or were McDonald's crew members, that is, employees responsible for taking orders for, preparing, and serving McDonald's products.  All crew members have the same basic job responsibilities, and are ostensibly subject to the same policies and procedures with respect to schedules, time off, discipline, performance evaluations, raises, and promotions, as set forth in McDonald's employee handbook and other corporate documents.

**B.     The Racially Hostile Work Environment Established by the General Manager at the Walt Loop Restaurant and Condoned by McDonald's**

31.     The General Manager became the supervisor of the Walt Loop McDonald's Restaurant in or around October 2019.  The General Manager supervises all employees at the Walt Loop McDonald's Restaurant, including Plaintiffs.  The General Manager is responsible for hiring, training, promoting, evaluating, and disciplining employees, including Plaintiffs.  The General Manager also sets the work schedules for all employees, including Plaintiffs, which involves determining the number of hours worked, the time of day worked, and whether and when employees may take days off.

32.     Since she arrived at the Walt Loop McDonald's Restaurant, the General Manager has engaged in severe and pervasive discrimination against and harassment of Black employees and customers, in violation of Section 1981 of the Civil Rights Act of 1866 and Title VII of the Civil Rights Act of 1964.

11

33.     For example, on or around March 10, 2020, Ms. Scott was taking orders at the drive-through window with another employee, serving a customer who was a Black woman.  The customer requested grape jelly and ketchup to accompany an order of a sausage biscuit and hash browns.  The General Manager said to Ms. Scott that, "It's always Black people who want free stuff."  She followed up by stating that Black people are "aggressive and trying to fight," and that "all they want to do is smoke weed."

34.     One of the employees who overheard the General Manager's comments confronted the General Manager and pointed out that, just moments before, the General Manager had no objection when a white customer had requested extra sauce.  The General Manager shook her head and walked away.

35.      Between approximately April 22 and May 5, 2020, the Walt Loop McDonald's Restaurant hosted a promotion that provided free meals to front-line workers—e.g., health care workers, police officers, firefighters, and paramedics—responding to the COVID-19 pandemic.

36.     Throughout that promotion, the General Manager consistently required only Black front-line workers to show their employment badges in order to receive a free meal.  The General Manager gave free meals to non-Black customers without requiring that they show proof that they were front-line workers.

37.     On or about July 6, 2020, a Black customer became upset about how her order was handled.  The General Manager refused to engage with the customer and refused to give the General Manager's name.  The customer raised her voice and stated that she would report the store to corporate headquarters, but she did not say or do

anything threatening.  The General Manager responded by calling the police.  The General Manager later said that it would not matter if the customer called corporate headquarters, because the call would be routed back to the store.

38.     The General Manager's handling of the July 6, 2020 customer complaint is in complete contrast to how the General Manager acts when non-Black customers become upset about their orders.  In those cases, the General Manager follows McDonald's policy to mollify the customer and make it right, such as by offering a free cookie or super-sizing the customer's order.

39.     These are not the only examples of disparate treatment of Black customers.  There have been several occasions where the General Manager mistreated Black customers who complained about wrong orders (e.g., by walking away from a concerned customer without addressing the concern), while mollifying non-Black customers with the same or similar complaints (e.g., by providing a refund).

40.     The General Manager often requires Black crew members to sweep and mop the floor of the store, even though McDonald's employs a separate maintenance person (not a crew member) for this purpose.  The General Manager does not assign non-Black crew members to sweep and mop the store, but limits their cleaning responsibilities to their own work areas such as tables where they prepare food.

41.     The General Manager administers the system governing time off for employees at the Walt Loop McDonald's Restaurant in a manner that discriminates against Black employees and subjects them to unwarranted discipline.  Employees at the Walt Loop McDonald's Restaurant request time off by writing their request in a book

maintained by the General Manager.  Although the General Manager has stated that the policy is that the first few workers to ask for time off will receive the time off, this often does not occur in practice.  The General Manager often denies time-off requests from Black crew members, while allowing non-Black crew members to take time off, even when they request the time off later than the Black crew members.

42.     When Black crew members are not granted their time-off requests and then are unable to report to work on the day they requested off, they are marked as "no-call/no-show" and subject to discipline, whereas the same is not true for non-Black employees.  For example, on information and belief, when a Black crew member requested time off approximately a week in advance to attend a funeral in mid-July, was denied the day off, and then decided to attend the funeral, the Black crew member was written up.  When non-Black workers do not report to work on days they have requested off but that were not approved, they are not subject to discipline or are disciplined less harshly.  For example, on information and belief, that same weekend, a non-Black crew member called out for her birthday but was not disciplined.

43.     The General Manager is more critical of Black workers than non-Black workers engaging in the same conduct.  For example, on one occasion, Mr. Moody's shirt had become untucked, and the General Manager immediately directed him to tuck it in.  Even though a non-Black employee was standing nearby with an untucked shirt, the General Manager did not say anything to the non-Black employee.  When Mr. Moody pointed this out, the General Manager snapped at him, saying that he was not a manager.

44.     Black workers raised their concerns about the General Manager's racist comments and conduct to Linda Garcia, their Human Resources Representative ("Human Resources Representative"), and Andreas Gonzalez, the Regional Manager ("Regional Manager"), both of whom are corporate McDonald's employees responsible for supervising multiple McDonald's corporate-owned restaurants.  Those corporate representatives refused to take any action to redress the hostile work environment created by the blatant discrimination towards Black customers and the intentional discrimination and intolerable working conditions under which Black workers labor at the Walt Loop McDonald's Restaurant, explaining that because this particular General Manager runs a very profitable store, nothing would be done.  In short, McDonald's placed profitability over respect for the lives and well-being of its Black workers and customers.

45.     Since the current General Manager started, one of three Black managers has left the store and, on information and belief, another has been demoted.

46.     Together, the General Manager, Human Resources Representative, and Regional Manager, with the blessing of their higher-ups in the corporate offices of McDonald's, fostered a system of intentional racial discrimination and harassment of Black crew members at the Walt Loop McDonald's Restaurant, including Plaintiffs, and then retaliated against Plaintiffs for opposing the race discrimination to which they and others were subjected.

C.     **Plaintiff Monica Scott**

47.     Ms. Scott worked at McDonald's corporate owned and operated restaurants for a total of approximately four years.  She worked at the Walt Loop

McDonald's Restaurant beginning in October 2019.  Prior to working at the Walt Loop

Restaurant, she worked at two different corporate-owned McDonald's restaurants in

Auburndale, Florida.  When she began her employment with McDonald's restaurants, she

hoped she would become a manager.  While working at the Auburndale stores, Ms. Scott

received consistently favorable evaluations and was repeatedly provided periodic raises.

She was not subject to any discipline.

48.     The General Manager directed to Ms. Scott her comments on or about

March 10, 2020 that, "it's always Black people who want free stuff," that Black people

are "aggressive and trying to fight," and that "all they want to do is smoke weed."

49.     The General Manager's racist comments about Black people were

extremely upsetting to Ms. Scott.  When Ms. Scott first heard the comments, she could

not think and could not concentrate on the order she was attempting to take over her

headset, and instead had to ask the customer to repeat the order.  She felt like a person

with no clothes.  She choked up, and took a break as soon as possible.

50.     Later that day, in the break room, Ms. Scott confronted the General

Manager about her racist comments, telling her that her comments were not fair, that the

comments had hurt her, and that the General Manager had not made similar comments

when non-Black customers made the same requests.  The General Manager pretended to

apologize, but instead made more racist comments, stating "I am sorry if I offended you,

but you know what I say is true."

51.     Shortly after Ms. Scott began work at the Walt Loop McDonald's

Restaurant, the Regional Manager had told Ms. Scott that he wanted her to be in the

management class.  She rearranged her schedule so she could attend the management class and was told she would be made a swing manager, a position that pays more and has additional benefits like paid time off.  As a result of the General Manager's racist comments to Ms. Scott while working at the drive-through window, which occurred shortly before Ms. Scott was to attend the management class, Ms. Scott felt she could no longer pursue the promotion.  She explained to the General Manager that she did not feel comfortable working under her leadership as a manager if she felt that way about Black people.

52.     Approximately two days after Ms. Scott confronted the General Manager about her racist comments about Black people, the General Manager directed Ms. Scott to clean the ceiling tiles in the store, which is not part of Ms. Scott's (or any crew member's) ordinary job.  In fact, the maintenance person was present in the store and asked Ms. Scott what she was doing, because it was not Ms. Scott's job, but, rather, the job of the maintenance person.  The General Manager then directed Ms. Scott to wipe down the walls, to sweep up the parking lot, and to clean trash out from underneath the grill on her knees, none of which are tasks that are ordinarily part of her or other crew members' job.  This work is generally done by a specifically assigned maintenance worker.  The General Manager did not assign non-Black crew members to undertake similar arduous cleaning tasks.

53.     Later that day or shortly thereafter, the General Manager required Ms. Scott to leave the break room while she was waiting for her ride to leave for the day,

while permitting a non-Black crew member to remain in the break room while waiting for the non-Black crew member's ride.

54.     The General Manager assigned cleaning tasks to Ms. Scott that were not within her normal job duties, and forbade her to wait in the break room, because she is Black and in retaliation for Ms. Scott having called her out about the racist comments about Black people.

55.     In the meantime, Ms. Scott observed that the General Manager also treated other Black customers differently than non-Black customers.  For example, during a promotional give-away of free meals to front-line workers, the General Manager provided free meals to non-Black front-line workers without question, but demanded identification before providing free meals to Black front-line workers.  It was extremely distressing to Ms. Scott to see that the General Manager treated even front-line workers like nurses with disrespect, just because they were Black.

56.     Ms. Scott was initially afraid to raise her concerns about the General Manager with anyone else.  But in or around late April 2020, Ms. Scott summoned the courage to contact the Regional Manager in charge of the Walt Loop McDonald's Restaurant, to report the General Manager's statements from March about Black people allegedly wanting free stuff, being aggressive, and only wanting to smoke weed.

57.     The Regional Manager did nothing to address the concerns Ms. Scott raised.  On information and belief, the Regional Manager told the General Manager that Ms. Scott had complained to the Regional Manager about the General Manager's mistreatment of Black customers.

58.     Ms. Scott also sought to contact "corporate" to register her complaint. Unsure of whom to contact, she called the number on McDonald's drink cups provided to customers.  The person who answered told her that the number she had called was for customer complaints, not employee complaints, but that she would connect her to someone who could help.  Ms. Scott was connected to the Human Resources Representative who oversees the Walt Loop McDonald's Restaurant, and left a voicemail describing the General Manager's racist statements about Black people.  The Human Resources Representative never responded to Ms. Scott's phone call.

59.     Not long after Ms. Scott's call to Human Resources, however, the Human Resources Representative whose voicemail Ms. Scott reached was in the Walt Loop McDonald's Restaurant to address other issues at the store.  The Human Resources Representative asked Ms. Scott about uniforms and equipment at the store but did not mention Ms. Scott's voicemail.  Ms. Scott took the initiative to follow up, raising with the Human Resources Representative in person her concerns about the General Manager's racist comments.

60.     The Human Resources Representative did not take Ms. Scott's concerns seriously.  Instead, the Human Resources Representative explained that she knows the General Manager outside of the workplace and said that the General Manager was not a racist.  She also explained that the General Manager was not going anywhere, because the General Manager's store was profitable.  The Human Resources Representative did nothing to remedy the concerns Ms. Scott raised.  On information and belief, the Human

Resources Representative told the General Manager that Ms. Scott had complained about the General Manager's mistreatment of Black customers.

61.     Since Ms. Scott raised her concerns about race discrimination against Black customers to the General Manager, the Regional Manager, and the Human Resources Representative, the General Manager has subjected Ms. Scott to a series of adverse employment actions.  The General Manager subjected Ms. Scott to these adverse employment actions because Ms. Scott is Black, and in retaliation for Ms. Scott's complaining to the General Manager, Regional Manager, and Human Resources Representative about the General Manager's discrimination against Black customers.

62.     On or about June 19, 2020, "Juneteenth," and after Ms. Scott had already raised concerns about racial discrimination with the General Manager, Regional Manager, and Human Resources Representative, Ms. Scott, Mr. Moody, Ms. Booker, and another employee at the Walt Loop McDonald's Restaurant signed a petition protesting the racial discrimination at the store and delivered it to the General Manager at a time when it was not disruptive to store operations.  The General Manager at first grabbed the copy of the petition, and then when she realized what it was, she dropped it and said she did not want it.  The General Manager then required Ms. Scott and those with her to leave the store premises and said someone should call the police.

63.     The petition was entitled: "We believe in a Fair and Equal Workplace!" The petition stated:

> Workplace unfairness breeds an environment of discrimination, distrust, friction and potential violence or legal action.  Employees who are treated unfairly aren't allowed to achieve workplace success to their fullest potential.  Allowing workplace unfairness to continue sends the message to employees that this type of

behavior is acceptable.  We demand management takes steps to keep all employees feeling respected and treated as equals while building a positive work environment.  We demand to meet with management to discuss the multiple issues of inequality and unfairness that currently plague our environment.

64.     No changes to the Walt Loop McDonald's Restaurant's operations or McDonald's approach to issues of discrimination, inequality, and unfairness were made in response to the petition.

65.     To the contrary, the General Manager continued to subject Ms. Scott to adverse employment actions, including discipline without justification and, ultimately, termination.

66.     When Ms. Scott reported to work the day after she had presented the petition to the General Manager, the General Manager deliberately assigned her to demeaning cleaning tasks rather than the work she normally would have performed at the front counter.  Even though the store was very busy, and Ms. Scott was ready to jump into her regular duties, the General Manager said, "No, I got something for her to do," and required Ms. Scott to wipe the walls, and mop and then re-mop the premises repeatedly.  Finally, the General Manager required Ms. Scott to clean the garbage cans, something the General Manager had never asked Ms. Scott to do before, and which is ordinarily the job of the maintenance person, not a crew member.  The trash can assignment was designed to be deliberately demeaning to Ms. Scott: The General Manager ordered Ms. Scott to stand out in front of the store and scrub the grease-caked garbage cans by hand with a towel, when the sensible way to clean them would have been to spray them with a de-greasing agent in the back of the store, as Ms. Scott suggested.  The General Manger was in essence calling Ms. Scott "trash" or "garbage."

The General Manager did not assign non-Black crew members to sweep, mop, and clean the garbage cans.  The General Manager assigned Ms. Scott these demeaning tasks not ordinarily required of crew members because she is Black, and in retaliation for her having protested against racial discrimination at the store.

67.     After Ms. Scott submitted the petition, the General Manager began directing Ms. Scott to clock out when using the restroom, even though employees are not supposed to clock out when they use the restroom, requiring employees to clock out for short breaks such as to use the restroom violates the Fair Labor Standards Act, and other similarly situated crew members were not required to clock out when using the restroom. The General Manager commanded Ms. Scott to clock out when using the restroom because Ms. Scott is Black, and in retaliation for Ms. Scott's complaints about race discrimination at the Walt Loop McDonald's Restaurant.

68.     The General Manager significantly reduced the number of hours Ms. Scott was assigned to work in June 2020.  Ms. Scott had previously worked approximately 38-39 hours per week.  As of July 2020, Ms. Scott routinely worked approximately 24 hours per week.  Ms. Scott is a mother and cannot afford to raise her children working only 24 hours per week.  She has been living with her three children and boyfriend in a motel room, with rent due weekly.  With fewer hours, she has been forced to cut back on how much she eats, to make sure she has enough for her children, and she has had to borrow money from family to cover expenses.  As a result of the retaliatory and discriminatory cuts to her hours, she has acquired a second job, which began at the end of July.

69.     Ms. Scott was told her hours were cut because of COVID-19, but the store has remained busy.  On information and belief, non-Black crew members, including Lisette, Aratsi, Rocky, Carla, Jaden, and Donna continued to work full-time, that is, close to 40 hours a week.

70.     The Walt Loop McDonald's Restaurant continued to hire new employees even as it cut Ms. Scott's hours.  The Walt Loop McDonald's Restaurant posted a "Now Hiring" sign in the window and is soliciting applications for crew member applications online.  New crew members who performed the same tasks Ms. Scott performed also started work in the store as Ms. Scott's hours were being cut.

71.     The General Manager has rejected Ms. Scott's time off requests in favor of those of non-Black crew members, even when Ms. Scott had requested the time off earlier.  For example, approximately one month before the Fourth of July, Ms. Scott requested time off for that weekend by writing her request for days off on July 3 and July 6 in the book maintained by the General Manager.  She observed that there was only one prior request in the book for that time off.  The General Manager nevertheless denied Ms. Scott's request and scheduled her to work on July 3.  Ms. Scott had to cancel reservations she had made for her children to enjoy a few days of vacation out of town, and instead report to work on July 3.  A non-Black crew member, Rocky, asked a few days in advance for the same day off that Ms. Scott had previously requested much earlier, and Rocky was granted the day off.  The General Manager rejected Ms. Scott's request for time off because Ms. Scott is Black, and in retaliation for Ms. Scott's complaints about racial discrimination at the Walt Loop McDonald's Restaurant.

72.     In early July 2020, Ms. Scott, Mr. Moody, and Ms. Booker had clocked out for the day and were having a conversation in the parking lot.  The General Manager yelled at Plaintiffs, telling them they were soliciting, and required them to leave the premises immediately.  Ms. Scott has not observed the General Manager reacting this way when non-Black employees have conversations after work in the parking lot.

73.     Ms. Scott has always been an exemplary worker, and prior to working for the current General Manager, she received positive reviews and periodic raises.  In early July 2020, the current General Manager gave Ms. Scott a performance review with twelve "zeros" for deficient performance.  Ms. Scott was extremely discouraged by this review, which was inconsistent with her performance, commitment to her job, and her prior reviews, and which adversely affected her ability to receive a raise.  On information and belief, similarly situated non-Black crew members, and crew members who had not complained about race discrimination, received positive performance reviews, and raises as a result.  Ms. Scott received a negative performance evaluation and no raise because she is Black, and in retaliation for having spoken out about race discrimination at the Walt Loop McDonald's Restaurant.

74.     The General Manager and the Regional Manager who were providing Ms. Scott with her performance review also asked her to sign a document disclaiming the petition she had submitted with her colleagues.  Ms. Scott refused to sign, and the Managers refused to provide her with a copy of the document they had asked her to sign.  Ms. Scott was then disciplined with a "no-call/no-show" for an earlier absence, one for which she had a doctor's note.

75.     On July 8, 2020, as the COVID-19 pandemic continued to surge, Ms. Scott called in approximately two hours and fifteen minutes before her shift was to start to report that she was not feeling well.  McDonald's requires employees who call out sick to provide two hours' notice.  Ms. Scott has asthma and was having an asthma attack on that date, as she explained to one of the more junior store managers when she called in. Ms. Scott waited until just before the required time period to call in because she was hoping to be able to work her shift (and thus not to lose the necessary income), but she was diligent, and even set an alarm at 5:15 a.m. to ensure she provided the requisite notice in accordance with McDonald's policy.  When Ms. Scott reported to work on July 9, 2020, the General Manager wrote up Ms. Scott for not calling out early enough the previous day, although she had fully complied with the sick leave notice policy.  When she provided proof that she had called in more than two hours before her shift, the General Manager then said Ms. Scott hadn't explained why she needed to stay home, although she had.  The General Manager wrote Ms. Scott up even though she had fully complied with McDonald's sick leave policy, because Ms. Scott is Black, and because Ms. Scott had complained about race discrimination at the Walt Loop McDonald's Restaurant.

76.     The Regional Manager also wrote up Ms. Scott on July 9, 2020 without any basis.  The Regional Manager told Ms. Scott that he had seen her on camera dumping garbage in the parking lot.  Ms. Scott asked to see the video and was shown a picture of her getting into her car, but the Regional Manager did not show her any video footage. Ms. Scott tried to explain that she had not dumped garbage in the parking lot, and that she

was not even on the premises on July 8, 2020, because she had called out sick.  The Regional Manager nevertheless wrote up Ms. Scott for dumping garbage, but would not provide Ms. Scott with a copy of the write-up.  Ms. Scott was told that this warning was her final written warning, and that if she received further discipline, she would be subject to termination.  Ms. Scott was very hurt that management would think she would do something like dump garbage in the parking lot, since she takes her job seriously and cares greatly about respecting her workplace, fellow workers, and customers.  The Regional Manager wrote Ms. Scott up and gave her a final warning for something she had not done, because Ms. Scott is Black, and because Ms. Scott had complained about race discrimination at the Walt Loop McDonald's Restaurant.

77.     On July 17, 2020, Ms. Scott, Mr. Moody, and Ms. Booker filed the original complaint in this lawsuit and filed with the EEOC and FCHR charges against McDonald's alleging racial discrimination in the form of disparate treatment, a hostile work environment, and retaliation.

78.     Ms. Scott was out of work for a COVID-19-related mandatory quarantine from approximately July 15 to August 4, and then again from approximately August 28 to September 19.

79.     On September 20, 2020, the day she was to report back to work after the second quarantine, Ms. Scott experienced car problems and was unable to get to her scheduled shift at McDonald's.  In accordance with McDonald's policy, Ms. Scott attempted to call the restaurant prior to the start of her shift to alert the manager that she would not be able to come in to work.  Ms. Scott's own phone battery had died, so she

used her son's phone to make the calls.  Ms. Scott tried to call the restaurant at least five times, but every time she called, the line was busy and she could not get through to anyone at the store.  Because her car had broken down, Ms. Scott was unable to report for her shift.

80.     On September 23, 2020, Ms. Scott spoke with the Human Resources Representative by telephone regarding the shift she missed on September 20, 2020.  Ms. Scott explained that she had tried repeatedly to call the restaurant but could not reach anyone.  Ms. Scott also confirmed that her car had been repaired, and that she would be present for her next shifts on the following Sunday, September 27, 2020 and Monday, September 28, 2020.

81.     On September 27, 2020, Ms. Scott reported for her shift.  The General Manager and Regional Manager summoned Ms. Scott to the office and informed her that she was terminated.  The Regional Manager at first stated that she was terminated because she missed her shift the previous Sunday, September 20, and had not called in.  Ms. Scott explained that she had tried to call in, and she had discussed her situation with the Human Resources Representative.  The Regional Manager then stated that Ms. Scott was terminated because she had received a final written warning for attendance, had missed her shift on the previous Sunday, and inability to work a shift because of car problems was not an approved reason for missing a shift.  Ms. Scott was never told she had received any final written warning for attendance; the only final warning she had been given was the baseless warning premised on supposedly throwing garbage in the parking lot, something she did not do.

27

82.     On information and belief, many non-Black employees at the Walt Loop McDonald's Restaurant have missed shifts because of car problems and have not been disciplined, including non-Black crew members Jaden, Nick, Vanessa, and Lisette (who was subsequently promoted).  Indeed, Black crew members, including Ms. Scott and Ms. Booker, have had excused absences for car trouble in the past.  It is not McDonald's normal practice to terminate crew members for work absences caused by car problems.

83.     The General Manager and Regional Manager terminated Ms. Scott because of her race and in retaliation for her having filed this lawsuit and an EEOC charge complaining about race discrimination at McDonald's.

84.     Ms. Scott has suffered extreme emotional distress as a result of the foregoing behavior, including feeling terrible while working at the Walt Loop McDonald's Restaurant, where she felt that management looked at her like trash.  She has experienced sleeplessness, anxiety, headaches, and crying because of her toxic work environment and the retaliation she has faced.  Ms. Scott was under constant stress regarding providing for her family as a result of her reduced hours and, now that her employment has been terminated, the economic and emotional pressures she faces are only more dire.  Ms. Scott feels ashamed at having to tell her children that she cannot take them to certain activities because she can no longer afford to do so.  She feels like she has lost the energy to play with her children, and she feels awful when her children ask her what is wrong but she cannot tell them, because she does not want them to worry.  It is "wearing on [her] heart" that her former General Manager has the opinions about Black people she has expressed, and she feels like she is being tossed around with no

power to remedy the situation because her efforts to improve her former workplace for
herself and others have been blocked.

### D.     **Plaintiff Augusta Moody**

85.     Mr. Moody began working at the Walt Loop McDonald's Restaurant in
approximately July 2019.

86.     Mr. Moody was made aware of the General Manager's comments to Ms.
Scott that Black people want things for free, are "aggressive," and only "want to smoke
weed." He has observed the General Manager discriminating against Black customers,
including by requiring only Black front-line workers, but not other front-line workers to
present identification in order to receive promotional meals. He was also present when
the General Manager called the police on a Black customer who was complaining about
an issue at the restaurant in a non-threatening manner. Seeing the great disrespect with
which the General Manager treats Black customers makes Mr. Moody feel frustrated and
hopeless.

87.     Mr. Moody has registered complaints with the Regional Manager and the
Human Resources Representative regarding the General Manager's racist comments and
differential treatment of Black workers and Black customers. Neither the Regional
Manager nor the Human Resources Representative made any changes to address the
issues regarding racist comments or conduct Mr. Moody raised. On information and
belief, the Regional Manager and Human Resources Representative told the General
Manager that Mr. Moody had complained about her racist conduct.

88.     The Human Resources Representative made clear that the General Manager was not going anywhere because management was satisfied with the profitability of the store, and told Mr. Moody he could transfer to a different McDonald's store if he had a problem with the way the Walt Loop Restaurant was managed.  Mr. Moody found this very discouraging, as he understood that nothing about McDonald's racist culture was going to change.  He didn't want to just abandon other Black workers at the Walt Loop McDonald's Restaurant; rather, he wanted to create positive change.  It would also be difficult for him to change stores, as he does not have reliable access to transportation.

89.     Mr. Moody, along with Ms. Scott, Ms. Booker, and another employee, signed the petition advocating against discrimination and for a fair and equal workplace, and requesting to meet with management, and delivered that petition to the General Manager on or about June 19, 2020, Juneteenth.  Like Ms. Scott, Mr. Moody was required to leave the premises upon submitting the petition.

90.     Since Mr. Moody complained about race discrimination, the General Manager and the Regional Manager have subjected Mr. Moody to a series of adverse employment actions.  The General Manager and Regional Manager subjected Mr. Moody to these adverse employment actions because Mr. Moody is Black, and in retaliation for Ms. Moody's complaining to the General Manager, Regional Manager, and Human Resources Manager about discrimination against Black people.

91.     After Mr. Moody registered his complaints about race discrimination, the General Manager reduced Mr. Moody's hours substantially.  Prior to June 2020, Mr.

Moody regularly worked five days per week, typically for 37-39 hours.  His weekly hours

then sharply declined.  During the week of July 6, 2020, for example, he was scheduled

to work 22 hours, and during the week of July 13, he was scheduled to work 23 hours.

Mr. Moody, like Ms. Scott, was told his hours were being reduced as a result of the

COVID-19 pandemic, but the Walt Loop McDonald's Restaurant remained busy and

appeared to be hiring new crew members who performed the same tasks Mr. Moody

performed.  On information and belief, non-Black crew members, including Rocky,

Carla, Jaden, Donna, Lisette, Aratsi, and Moses continued to work close to 40 hours per

week even while Mr. Moody's hours were cut.  The General Manager cut Mr. Moody's

hours because he is Black, and because he complained about racial discrimination at the

Walt Loop McDonald's Restaurant.

92.     McDonald's reduction of Mr. Moody's hours, and the subsequent

unpredictability, caused Mr. Moody severe anxiety, as he knew he must still pay for food,

lodging, gas, and phone bills, and find a way to provide for his family on less.

93.     Mr. Moody has also been subjected to baseless or disproportionately

severe discipline because he is Black, and because he complained about race

discrimination at the Walt Loop McDonald's Restaurant.

94.     On or about May 26, 2020, Mr. Moody told a non-employee, the

boyfriend of crew member Vanessa, that the non-employee could not stand in the worker

area of the restaurant.  Vanessa called the General Manager to complain.  Although the

General Manager was not present at the time and could not have seen what happened, she

took Vanessa's word for what had happened, and did not even bother to get Mr. Moody's

side of the story.  The General Manager gave Mr. Moody a three-day suspension, saying he was acting aggressively and stood too close to the non-employee in light of COVID-19.  Mr. Moody had not done either of these things.  The General Manager believed Vanessa over Mr. Moody in imposing discipline because Mr. Moody is Black.  Mr. Moody contacted the General Manager and Regional Manager about the unjustified suspension.  Two days after Mr. Moody was sent home, he was contacted by the Regional Manager, who said the Regional Manager had reviewed the video and understood now that there was no reason for Mr. Moody to be suspended.  He was permitted to return to work the next day.  The Human Resources Representative later followed up with Mr. Moody about this incident, but Mr. Moody was never paid for the time he was unable to work as a result of the unjustified suspension.

95.    On another day, Mr. Moody was seven minutes late for a 7:30 a.m. shift. The General Manager had scheduled Mr. Moody for a 7:30 a.m. shift even though Mr. Moody had listed his availability as 8:00 a.m.  It is McDonald's policy for managers to take into account crew members' availability when preparing schedules, and crew members should not be scheduled to work when they are not available.  It is difficult for Mr. Moody to arrive before 8:00 a.m., because he carpools with another person whose schedule does not permit him to arrive before 8:00 a.m.  The General Manager wrote Mr. Moody up for tardiness, even though Mr. Moody had clearly communicated this constraint on his availability.

96.    That same day, Mr. Moody asked the General Manager to repeat something she said because the room was noisy and he could not hear her.  The General

Manager then wrote him up a second time in the same day, for insubordination, even though he was not being insubordinate, but merely had difficulty hearing.  The General Manager wrote up Mr. Moody for insubordination because he is Black.

97.     Not long thereafter, Mr. Moody was working the grill alone during peak hours.  It was so busy that Mr. Moody was having difficulty keeping up and requested help, which is typically granted, especially during peak.  Instead of assisting Mr. Moody, the General Manager sent him home and told him he was unable to do his job.  Mr. Moody was not paid for the remainder of his shift.  When non-Black crew members, or crew members who have not complained about discrimination, need help on the grill during a busy period, another crew member is assigned to help them.

98.     On or about July 3, 2020, Mr. Moody called in sick in accordance with McDonald's policy.  When he arrived for work the following Monday, July 6, 2020, the General Manager asked him for a doctor's note, which is not standard procedure for a one-day absence, and stated that she would write him up for a no-call/no-show on July 3, even though he had called out sick as required by McDonald's policy.

99.     On or about July 7, 2020, Mr. Moody saw that he was again scheduled to work a 7:30 a.m. shift.  When he asked the General Manager to change his schedule to reflect his availability, she refused.  Mr. Moody raised the scheduling issue with the Regional Manager, who changed the schedule to reflect Mr. Moody's availability.

100.    On July 8, 2020, Mr. Moody was scheduled to work a shift beginning at 8:00 a.m. and ending at 2:15 p.m.  Upon arriving at the Walt Loop McDonald's Restaurant for his shift, he was told by the General Manager he could not clock in for his

shift until 9:15 a.m.  Because the General Manager prevented him from clocking in for his shift, Mr. Moody was forced to forego his wages for an hour and fifteen minutes he had been scheduled and prepared to work.  Ordinarily, crew members work the shift for which they are scheduled and are not held off the clock past the time they are scheduled to start.

101.    Mr. Moody was present with Ms. Scott and Ms. Booker in early July 2020, when the General Manager left the restaurant to record Plaintiffs' conversation in the parking lot after work hours, accused them of soliciting, and required them to leave the premises.

102.    Mr. Moody was later approached by the Regional Manager and given a write-up saying that Mr. Moody had been outside loitering with his colleagues and that they were not allowed to do so for their own safety, because of COVID-19.  Non-Black employees sometimes speak to each other in the parking lot after work, even after the COVID-19 pandemic, and, on information and belief, are not told to leave.

103.    Until recently, Mr. Moody was on track to become a crew trainer.  Crew trainers are paid more than crew members.  The Human Resources Representative asked Mr. Moody whether he was interested in handling more responsibilities and earning more money, and said she would talk to his General Manager about the promotion.  The General Manager then provided him with a book to study for the assessment for the crew trainer position and started his training.

104.    In stark contrast to a couple months ago, when Mr. Moody was told by Human Resources he was in line for a promotion to crew trainer, the General Manager in

or around July 2020 gave Mr. Moody a very poor performance evaluation.  This evaluation, which adversely affected his ability to receive a raise, was provided shortly after he and his colleagues had submitted the petition seeking equal treatment for Black workers to the General Manager.  On information and belief, similarly situated non-Black crew members, and crew members who did not complain about race discrimination, were given better performance evaluations, and eventually raises.

105.    Mr. Moody was not promoted; he learned shortly after his review that two non-Black crew members working in the same restaurant, Aratsi and Lisette, were given the crew trainer positions instead.

106.    On July 17, 2020, Mr. Moody, along with Ms. Scott and Ms. Booker, filed the original complaint in this lawsuit.  He also filed with the EEOC and FCHR a charge against McDonald's alleging racial discrimination and retaliation.

107.    Mr. Moody was subsequently absent from work for two excused periods to quarantine because of exposure to COVID-19, approximately August 3-10 and then again approximately August 29-September 10.

108.    In retaliation for filing the charge and complaint, and because he is Black, McDonald's subjected Mr. Moody to additional unwarranted or excessive discipline soon after he returned to work, and ultimately terminated his employment.

109.    On September 14, 2020, the General Manager and the Regional Manager issued Mr. Moody an unjustified "final written warning."  The Regional Manager told Mr. Moody that he was being issued the warning because he had been a "no-call/no-show" and violated McDonald's dress policy.  On one of the days mentioned in the

warning, Mr. Moody informed the General Manager that he had a flat tire.  Normally crew members who call in with car trouble are excused from work and are not considered to be "no-call/no show."  On the second day mentioned, he had tried to call into the restaurant to explain that he would not be able to attend his shift but was unable to reach anyone at the restaurant.  There is no voicemail on the restaurant phone, so sometimes it just rings and rings and workers are unable to reach anyone to explain why they cannot report to work.  On the third day, Mr. Moody was told that he was wearing incorrect shoes, and was required to go home.  Mr. Moody had come to work wearing dark-colored, non-slip boots instead of his dark-colored, non-slip McDonald's-issued shoes because the McDonald's shoes had holes in them.  Mr. Moody had repeatedly requested replacement shoes but was not provided any.  The Regional Manager asked Mr. Moody to sign the final written warning, which Mr. Moody refused to do because the warning was not justified.  Mr. Moody also requested a copy of the warning, but neither the Regional Manager nor the General Manager would provide him a copy.

110.    On September 15, 2020, Mr. Moody reported to work.  The General Manager criticized him for not wearing his name tag.  On information and belief, the General Manager did not criticize a non-Black crew member nearby who also was not wearing a name tag, or a non-Black crew trainer or manager, who likewise were not wearing name tags.

111.    Also on September 15, 2020, Mr. Moody was placed on the grill alone. The grill is ordinarily staffed with two people during the busy change-over from breakfast to lunch.  The crew member who typically works the grill with Mr. Moody was

told she could go home early that day.  Mr. Moody was very busy with the rush of orders at the end of breakfast when manager Marari expressed impatience with Mr. Moody. Marari then went to the General Manager, who came over to the grill area.  Mr. Moody asked the General Manager for assistance, in light of the busy grill and the need to change over the grill supplies for lunch.  Both Marari and the General Manager responded with hostility.  Marari began pacing angrily and kept removing her mask, yelled at Mr. Moody that Mr. Moody would not yell at her any more (even though Mr. Moody had not yelled), and made a phone call on her personal phone that Mr. Moody could not understand because she was speaking in Spanish.  Mr. Moody perceived Marari's behavior as aggressive and was worried that Marari had called someone to complain about him.  Mr. Moody informed the General Manager that he felt unsafe and was permitted to go home for the rest of day.

112.    Mr. Moody followed up with the Regional Manager to let him know that he had left work that day, with the General Manager's permission, because he did not feel safe at work.  He later received a call from the Human Resources Representative, stating that an investigation was ongoing and that he should not report to work until the investigation was complete.

113.    On September 17, 2020, the Regional Manager and Human Resources Representative called Mr. Moody at home and told him that he was fired.  They said he was fired because of "misconduct" on September 15, 2020, but Mr. Moody did not engage in misconduct.  Instead, he was deliberately set up for failure by the General Manager, who left him alone on the grill during the busy change over from breakfast to

lunch, when he should have had help.  The General Manager set Mr. Moody up, and the Regional Manager and Human Resources Representative terminated him, because of Mr. Moody's race and because he had filed this lawsuit and spoken out about racial discrimination at the Walt Loop McDonald's Restaurant.

114.    Mr. Moody has suffered severe emotional distress as a result of the foregoing.  He feels discouraged that his efforts to address racist treatment of Black customers and discrimination against Black employees have not been taken seriously or resulted in any changes to his workplace.  Mr. Moody also feels tremendous stress resulting from the constant barrage of unjustified and disproportionate discipline, the initial reduction of hours, and, ultimately, his termination.  McDonald's treatment of Mr. Moody threatens his ability to pay for his living expenses and provide for his family.  Mr. Moody has applied for numerous other jobs but has not yet obtained one.

### E.    Plaintiff Faith Booker

115.    Ms. Booker has worked at the Walt Loop McDonald's Restaurant since October 2018.

116.    Ms. Booker has heard the General Manager say to groups of colleagues that Black people are lazy and always want things for free.

117.    Ms. Booker was present when the General Manager called the police on a Black customer who raised her voice but was not in any way threatening.

118.    Ms. Booker signed the petition protesting discrimination and requesting fair and equal workplace treatment that was submitted by her colleagues to the General Manager on Juneteenth.

119.     Ms. Booker spoke with the Human Resources Representative after submitting the petition.  Ms. Booker described her concerns, including regarding her hours being cut, but the Human Resources Representative downplayed those concerns and said that the General Manager would not do or say what Ms. Booker said she had.  Ms. Booker also spoke with the Regional Manager about the General Manager's racist behavior and comments.  Neither the Regional Manager nor the Human Resources Representative took any steps to remedy the situation.  On information and belief, the Regional Manager and Human Resources Representative told the General Manager that Ms. Booker had complained about the General Manager's racist behavior and comments.

120.     Since Ms. Booker raised her concerns about race discrimination, the General Manager has subjected Ms. Booker to a series of adverse employment actions.  The General Manager subjected Ms. Booker to these adverse employment actions because Ms. Booker is Black, and in retaliation for Ms. Booker's complaining to the General Manager, Regional Manager, and Human Resources Manager about race discrimination.

121.     The General Manager has progressively reduced Ms. Booker's hours.  Ms. Booker previously worked five days a week.  In June, she was reduced to three days per week and is now regularly scheduled for only two days per week.  The more Ms. Booker complained about race discrimination, including by submitting the petition and speaking to the Human Resources Representative, the more the General Manager cut Ms. Booker's hours.

122.    Ms. Booker has been told her reductions in hours are due to COVID-19, but has observed that the Walt Loop McDonald's Restaurant remains busy and appears to be hiring new crew members.  On information and belief, similarly situated non-Black crew members, including Lisette, Aratsi, Moses, Rocky, Carla, and Donna, are still scheduled to work for close to 40 hours per week.  The General Manager reduced Ms. Booker's hours because she is Black, and in retaliation for Ms. Booker's complaints about race discrimination at the Walt Loop McDonald's Restaurant.

123.    Ms. Booker was conversing with Ms. Scott and Mr. Moody in the parking lot in early July 2020 when the General Manager left the restaurant, began recording Plaintiffs, loudly accused them of soliciting, and required them to leave the premises immediately.

124.    Ms. Booker was later approached by the Regional Manager, who brought her a piece of paper he wanted Ms. Booker to sign saying that she had been outside loitering with her colleagues and that they were not allowed to do so for their own safety, because of COVID-19.  The paper further stated that if she could not follow that rule, she would be terminated.  Ms. Booker refused to sign the paper and asked for a copy of the document, but was not provided one.  Non-Black employees sometimes speak to each other in the parking lot after work, even after the COVID-19 pandemic, and, on information and belief, are not told to leave, or threatened with discipline for talking in the parking lot.

125.   Ms. Booker has always been an exemplary worker and has not previously been subject to discipline, other than in connection with time off that was discriminatorily denied.

126.   On July 17, 2020, Ms. Booker, along with Ms. Scott and Mr. Moody, filed a charge of racial discrimination with the EEOC and FCHR, and the original complaint in this case.

127.   Since filing this lawsuit and the EEOC charge, Ms. Booker has been given or threatened with baseless discipline.  The General Manager is trying to find excuses to discipline and eventually terminate Ms. Booker for having filed this lawsuit.

128.   On July 28, 2020, the Regional Manager and the General Manager presented Ms. Booker with a write-up stating that, on July 18, 2020, she had rung up food while being off the clock and used a register not assigned to her.  Ms. Booker did not ring up food while being off the clock, did not use a register not assigned to her, and was not even working on July 18, 2020, as she explained to the Regional Manager and the General Manager.  The Regional Manager and the General Manager refused to provide Ms. Booker with a copy of the write-up.

129.   In June 2020, Ms. Booker had requested time off for August 24, 2020 by writing in the availability book.  She had requested the time off because she had reservations to go to Orlando for her friend's birthday party.  The General Manager then took the book out of the office.  Ms. Booker reiterated her request to take August 24, 2020 off by leaving a note in the General Manager's office.  Nevertheless, Ms. Booker was scheduled to work on August 24, even though she had requested the time off many

weeks in advance to attend the out-of-town event.  On or about August 31, 2020, the Regional Manager presented Ms. Booker with a write-up, for not calling out with sufficient notice.  When presented with the write-up, Ms. Booker explained that she had requested the date off many weeks in advance.

130.    On September 21, 2020, Ms. Booker started working her shift.  Shortly thereafter, the General Manager, accompanied by a manager from another store, confronted Ms. Booker and told her she was receiving a write-up for being a "no-call/no-show" for a shift the previous Friday, September 18, 2020.  Ms. Booker had not been scheduled to work on the Friday in question, as she explained to the General Manager.  When the General Manager did not believe her, Ms. Booker took out her phone, which had a photograph of the schedule from the previous week demonstrating that Ms. Booker was not scheduled to work on the Friday in question.  Later, the General Manager acknowledged to Ms. Booker that Ms. Booker had not been on the schedule on the previous Friday, so had not been a "no-call/no-show."

131.    Ms. Booker has suffered severe emotional distress as a result of the foregoing, including dreading going to work every day.  Ms. Booker has five children and works two jobs to provide for her family.  McDonald's dramatic cut to her work schedule imperils her ability to pay for her living expenses and meet her family's needs.  She is constantly on edge, fearing she will be fired for something she did not do.  She is exhausted from handling two jobs, and from the uncertainty of not knowing what racist and retaliatory behavior she will face in her workplace.

## CAUSES OF ACTION

## COUNT 1 – 42 U.S.C. §1981:  DISCRIMINATION ON THE BASIS OF RACE; DISPARATE TREATMENT

### (Plaintiffs Scott, Moody, and Booker)

132.     Plaintiffs re-allege and incorporate by reference paragraphs 1-131 of this Complaint as though set out here word for word.

133.     McDonald's intentionally engaged in discriminatory conduct because of Plaintiffs' race.

134.     In particular, McDonald's failed to provide Plaintiffs with time off on the same terms as time off was provided to similarly situated non-Black employees; subjected Plaintiffs to unwarranted discipline; subjected Plaintiffs to harsher discipline than similarly situated non-Black employees; assigned Mr. Moody and Ms. Scott worse performance scores than the performance scores assigned to similarly situated non-Black employees (precluding raises); failed to promote Mr. Moody even though he had equal or better qualifications than non-Black employees who were promoted; and terminated Ms. Scott and Mr. Moody.

135.     Consequently, McDonald's violated Plaintiffs' right to make and enforce contracts and receive the full and equal benefit of the law as guaranteed by 42 U.S.C. §1981.

136.     McDonald's knew or should have known that its actions constituted unlawful race discrimination and showed malicious and/or reckless disregard for Plaintiffs' statutorily protected rights.

137.     As a direct result of McDonald's discriminatory acts, Plaintiffs are entitled to damages including, but not limited to:

       a.   Past and future lost wages and benefits;

       b.   Compensation for past and future physical and emotional distress;

       c.   Punitive damages;

       d.   Attorneys' fees and costs; and

       e.   Pre-judgment interest.

138.     As a direct result of McDonald's discriminatory acts, Plaintiffs are also entitled to declaratory and injunctive relief, as set forth in detail in the Prayer for Relief.

## COUNT 2 – 42 U.S.C. §1981:  DISCRIMINATION ON THE BASIS OF RACE; HOSTILE WORK ENVIRONMENT

### (Plaintiffs Scott, Moody, and Booker)

139.     Plaintiffs re-allege and incorporate by reference paragraphs 1-138 of this Complaint as though set out here word for word.

140.     McDonald's subjected Plaintiffs to severe and pervasive harassment based on their race that altered Plaintiffs' working conditions and created a hostile working environment.

141.     Despite having actual and constructive knowledge of the hostile work environment to which Plaintiffs were and are being subjected, McDonald's has failed to take immediate and appropriate corrective action to stop it.

142.     Consequently, McDonald's violated Plaintiffs' right to make and enforce contracts and receive the full and equal benefit of the law as guaranteed by 42 U.S.C. §1981.

143.    McDonald's knew or should have known that its actions constituted unlawful race discrimination, and showed malicious and/or reckless disregard for Plaintiffs' statutorily protected rights.

144.    As a direct result of McDonald's discriminatory acts, Plaintiffs are entitled to damages including, but not limited to:

      a.  Past and future lost wages and benefits;

      b.  Compensation for past and future physical and emotional distress;

      c.  Punitive damages;

      d. Attorneys' fees and costs; and

      e.  Pre-judgment interest.

145.    As a direct result of McDonald's discriminatory acts, Plaintiffs are also entitled to declaratory and injunctive relief, as set forth in detail in the Prayer for Relief.

### COUNT 3 – 42 U.S.C. §1981: DISCRIMINATION ON THE BASIS OF RACE; RETALIATION
### (Plaintiffs Scott, Moody, and Booker)

146.    Plaintiffs re-allege and incorporate by reference paragraphs 1-145 of this Complaint as though set out here word for word.

147.    Plaintiffs engaged in activities protected under 42 U.S.C. §1981 and other civil rights statutes when they registered complaints with the Regional Manager and Human Resources Representative regarding racial discrimination occurring at the Walt Loop McDonald's Restaurant.  They likewise engaged in activity protected under 42 U.S.C. §1981 and other civil rights statutes when they circulated and submitted to the General Manager a petition protesting racial discrimination and advocating for a fair,

equal, and non-discriminatory workplace.  They further engaged in protected activity by participating in the EEOC and FCHR charge-filing process and filing the original complaint in this lawsuit.

148.    McDonald's violated 42 U.S.C. §1981 when it, through the General Manager and Regional Manager, took materially adverse employment actions against Plaintiffs with the purpose of retaliating against them because of their participation in protected activities and opposition to race discrimination, including a hostile work environment, disparate treatment of Black employees, and disparate treatment of Black customers.

149.    In particular, McDonald's reduced Plaintiffs' hours; subjected Plaintiffs to unwarranted discipline; subjected Plaintiffs to unequal discipline; downgraded Ms. Scott and Mr. Moody's performance evaluation score thus precluding raises to which they were otherwise entitled; deliberately demeaned Ms. Scott by assigning her to arduous cleaning duties, ordering her to leave the employee break room and requiring her to clock out when using the restroom; failed to promote Mr. Moody; and terminated Ms. Scott and Mr. Moody.

150.    McDonald's knew or should have known that its actions constituted unlawful retaliation and showed malicious and/or reckless disregard for Plaintiffs' statutorily protected rights.

151.    As a direct result of McDonald's retaliatory acts, Plaintiffs are entitled to damages including, but not limited to:

    a.    Past and future lost wages and benefits;

    b.   Compensation for past and future physical and emotional distress;

    c.   Punitive damages;

    d.   Attorneys' fees and costs; and

    e.   Pre-judgment interest.

152.    As a direct result of McDonald's discriminatory acts, Plaintiffs are also entitled to declaratory and injunctive relief, as set forth in detail in the Prayer for Relief.

**COUNT 4 – TITLE VII, 42 U.S.C. §§2000e, *et seq*.:  DISCRIMINATION ON THE BASIS OF RACE; DISPARATE TREATMENT**

**(Plaintiffs Scott and Moody)**

153.    Plaintiffs re-allege and incorporate by reference paragraphs 1-152 of this Complaint as though set out here word for word.

154.    On July 17, 2020, Ms. Scott, Mr. Moody, and Ms. Booker each filed a timely Charge of Discrimination with the EEOC against McDonald's alleging disparate treatment, hostile work environment, and retaliation, all in violation of Title VII, 42 U.S.C. §§2000e, *et seq*.  Ms. Scott's charge is attached hereto as Exhibit A, Mr. Moody's charge is attached hereto as Exhibit C, and Ms. Booker's charge is attached hereto as Exhibit E.

155.    The EEOC on September 16, 2020 issued a Notice of Suit Rights to Ms. Scott stating that the EEOC was closing its file on her Charge because she had filed a lawsuit in a court of competent jurisdiction.  That Notice is attached hereto as Exhibit B. Also on September 16, 2020, the EEOC issued a Notice of Suit Rights to Mr. Moody stating that the EEOC was closing its file on his Charge because he had filed a lawsuit in a court of competent jurisdiction.  That Notice is attached hereto as Exhibit D.

156.    McDonald's intentionally engaged in discriminatory conduct because of Plaintiffs' race.

157.    McDonald's subjected Ms. Scott and Mr. Moody to discrimination on the basis of race in the compensation, terms, conditions, and privileges of employment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a).

158.    In particular, McDonald's failed to provide Plaintiffs with time off on the same terms as time off was provided to similarly situated non-Black employees; subjected Plaintiffs to unjustified discipline when they did not in fact violate McDonald's policies; subjected Plaintiffs to harsher discipline than similarly situated non-Black employees; downgraded performance evaluation scores for Ms. Scott and Mr. Moody thus precluding raises; and failed to promote Mr. Moody even though he had equal or better qualifications than non-Black employees who were promoted.

159.    McDonald's knew or should have known that its actions constituted unlawful race discrimination and showed malicious and/or reckless disregard for Plaintiffs' statutorily protected rights.

160.    As a direct result of McDonald's discriminatory acts, Plaintiffs are entitled to damages including, but not limited to:

        a.  Past and future lost wages and benefits;

        b.  Compensation for past and future physical and emotional distress;

        c.  Punitive damages;

        d.  Attorneys' fees and costs; and

        e.  Pre-judgment interest.

161.    As a direct result of McDonald's discriminatory acts, Plaintiffs are also entitled to declaratory and injunctive relief, as set forth in detail in the Prayer for Relief.

## COUNT 5 – TITLE VII, 42 U.S.C. §§2000e, *et seq*.:  DISCRIMINATION ON THE BASIS OF RACE; HOSTILE WORK ENVIRONMENT

### (Plaintiffs Scott and Moody)

162.    Plaintiffs re-allege and incorporate by reference paragraphs 1-161 of this Complaint as though set out here word for word.

163.    On July 17, 2020, Ms. Scott, Mr. Moody, and Ms. Booker each filed a timely Charge of Discrimination with the EEOC against McDonald's alleging disparate treatment, hostile work environment, and retaliation, all in violation of Title VII, 42 U.S.C. §§2000e, *et seq*.  Ms. Scott's charge is attached hereto as Exhibit A, Mr. Moody's charge is attached hereto as Exhibit C, and Ms. Booker's charge is attached hereto as Exhibit E.

164.    The EEOC on September 16, 2020 issued a Notice of Suit Rights to Ms. Scott stating that the EEOC was closing its file on her Charge because she had filed a lawsuit in a court of competent jurisdiction.  That Notice is attached hereto as Exhibit B. Also on September 16, 2020, the EEOC issued a Notice of Suit Rights to Mr. Moody stating that the EEOC was closing its file on his Charge because he had filed a lawsuit in a court of competent jurisdiction.  That Notice is attached hereto as Exhibit D.

165.    McDonald's subjected Plaintiffs to severe and pervasive harassment based on their race that altered Plaintiffs' working conditions and created a hostile working environment, in violation of Title VII.

166.     Despite having actual and constructive knowledge of the hostile work environment to which Plaintiffs are being subjected, McDonald's has failed to take immediate and appropriate corrective action to stop it.

167.     McDonald's knew or should have known that its actions constituted unlawful race discrimination, including hostile work environment, and showed malicious and/or reckless disregard for Plaintiffs' statutorily protected rights.

168.     As a direct result of McDonald's discriminatory acts, Plaintiffs are entitled to damages including, but not limited to:

    a.   Past and future lost wages and benefits;

    b.   Compensation for past and future physical and emotional distress;

    c.   Punitive damages;

    d.   Attorneys' fees and costs; and

    e.   Pre-judgment interest.

169.     As a direct result of McDonald's discriminatory acts, Plaintiffs are also entitled to declaratory and injunctive relief, as set forth in detail in the Prayer for Relief.

**COUNT 6 – TITLE VII, 42 U.S.C. §§2000e, *et seq*.:  DISCRIMINATION ON THE BASIS OF RACE; RETALIATION**

**(Plaintiffs Scott and Moody)**

170.     Plaintiffs re-allege and incorporate by reference paragraphs 1-169 of this Complaint as though set out here word for word.

171.     On July 17, 2020, Ms. Scott, Mr. Moody, and Ms. Booker each filed a timely Charge of Discrimination with the EEOC against McDonald's alleging disparate treatment, hostile work environment, and retaliation, all in violation of Title VII, 42

U.S.C. §§2000e, *et seq*.  Ms. Scott's charge is attached hereto as Exhibit A, Mr. Moody's charge is attached hereto as Exhibit C, and Ms. Booker's charge is attached hereto as Exhibit E.

172.   The EEOC on September 16, 2020 issued a Notice of Suit Rights to Ms. Scott stating that the EEOC was closing its file on her Charge because she had filed a lawsuit in a court of competent jurisdiction.  That Notice is attached hereto as Exhibit B. Also on September 16, 2020, the EEOC issued a Notice of Suit Rights to Mr. Moody stating that the EEOC was closing its file on his Charge because he had filed a lawsuit in a court of competent jurisdiction.  That Notice is attached hereto as Exhibit D.

173.   Plaintiffs engaged in activities protected under Title VII and other civil rights statutes when they registered complaints with the Regional Manager and Human Resources Representative regarding racial discrimination occurring at the Walt Loop McDonald's Restaurant.  They likewise engaged in activity protected under Title VII and other civil rights statutes when they circulated and submitted to the General Manager a petition protesting racial discrimination and advocating for a fair, equal, and non-discriminatory workplace.  They further engaged in protected activity by participating in the EEOC and FCHR charge-filing process and filing the original complaint in this lawsuit.

174.   McDonald's violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3(a), when it, through the General Manager and Regional Manager, took materially adverse employment actions against Plaintiffs with the purpose of retaliating against them because of their participation in protected activities and opposition to race

discrimination, including a hostile work environment, disparate treatment of Black employees, and disparate treatment of Black customers.

175.     In particular, McDonald's reduced Plaintiffs' hours; subjected Plaintiffs to unwarranted discipline; subjected Plaintiffs to unequal discipline; downgraded Ms. Scott and Mr. Moody's performance evaluation score thus precluding raises to which they were otherwise entitled; deliberately demeaned Ms. Scott by assigning her to arduous cleaning duties, ordering her to leave the employee break room and requiring her to clock out when using the restroom; and failed to promote Mr. Moody.

176.     McDonald's knew or should have known that its actions constituted unlawful retaliation and showed malicious and/or reckless disregard for Plaintiffs' statutorily protected rights.

177.     As a direct result of McDonald's retaliatory acts, Plaintiffs are entitled to damages including, but not limited to:

   a.   Past and future lost wages and benefits;

   b.   Compensation for past and future physical and emotional distress;

   c.   Punitive damages;

   d.   Attorneys' fees and costs; and

   e.   Pre-judgment interest.

178.     As a direct result of McDonald's discriminatory acts, Plaintiffs are also entitled to declaratory and injunctive relief, as set forth in detail in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court provide Plaintiffs with the following relief:

A.      Judgment in favor of Plaintiffs and against McDonald's for violation of 42 U.S.C. §1981 and Title VII, 42 U.S.C. §§2000e *et seq.*;

B.      A declaration that the actions of McDonald's constitute unlawful race discrimination;

C.      An injunction requiring McDonald's to remedy the civil rights violations described herein, and to prevent future violations, by, among other things:

       i.      Reinstating the employment of Ms. Scott and Mr. Moody;

       ii.      Reinstating Plaintiffs to a schedule of approximately 35-38 hours per week and enjoining the General Manager of the Walt Loop McDonald's Restaurant from reducing Plaintiffs' hours;

       iii.      Requiring the removal of discriminatorily imposed discipline and negative performance reviews from McDonald's records regarding Plaintiffs;

       iv.      Instructing the General Manager of the Walt Loop McDonald's Restaurant that racial discrimination towards Black customers and employees will not be tolerated and prohibiting the General Manager from engaging in such conduct;

       v.      Promoting Mr. Moody to Crew Trainer;

vi.      Implementing a safe reporting mechanism including multiple channels for reporting race discrimination, and adequately communicating that reporting mechanism to all McDonald's employees;

vii.     Adopting and implementing practices to ensure that McDonald's employees who report race discrimination are not the subject of retaliation;

viii.    Requiring McDonald's to provide employees at the Walt Loop Restaurant with time off and job assignments in a manner that does not discriminate on the basis of race.

D.     Judgment in an amount that the Court or jury determines to be fair, just, and adequate compensation for the damages that Plaintiffs have sustained, past and future, together with interest;

E.     An award of punitive damages that the Court or jury determines to be fair and sufficient to punish, penalize, and/or deter McDonald's from the harmful acts alleged herein;

F.     An award of reasonable attorneys' fees and costs; and

G.     Any other relief that the Court deems appropriate.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all those issues so triable as of right.

Dated: October 13, 2020              Respectfully submitted,

/s/ Peter Helwig
Peter Helwig
Florida Bar No. 0588113
Harris & Helwig, P.A.
6700 South Florida Avenue, Suite 31
Lakeland, Florida 33813
Phone: 863-648-2958
Facsimile: 863-619-8901
pfhelwig@tampabay.rr.com

Eve H. Cervantez,* Trial Counsel
Amanda C. Lynch*
Altshuler Berzon LLP
177 Post St., Suite 300
San Francisco, CA 94108
Phone: 415-421-7151
Facsimile: 415-362-8064
ecervantez@altshulerberzon.com
alynch@altshulerberzon.com

Mary Joyce Carlson*
1130 Connecticut Ave. NW, Suite 950
Washington, DC 20036
Phone: 202-340-5756
mj@maryjoycecarlson.com

*Counsel for Plaintiffs*

*\*Pro hac vice*